**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,

        *Plaintiff*,

    v.

U.S. DEPARTMENT OF EDUCATION and
LINDA MCMAHON, in her official capacity
as Secretary of Education,

        *Defendants*.

Case No. 1:25-cv-3553-CRC

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    A.    Lapse in Appropriations ................................................................................ 3

    B.    This Litigation ............................................................................................... 4

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

    I.    THIS COURT LACKS JURISDICTION. ............................................................ 7

        A.    District Court Jurisdiction Is Precluded Under The FSLMRS And
            The CSRA. ....................................................................................................... 7

        B.    AFGE's Challenge To The Original Out-Of-Office Message Is
            Prudentially Moot And Any Challenge As To The New Message Is
            Not Properly Pled In The Complaint. ...................................................... 17

    II.    THE DEPARTMENT'S OUT-OF-OFFICE MESSAGES ARE NOT
        PROTECTED UNDER THE FIRST AMENDMENT. ....................................... 20

    III.    AFGE'S REQUESTED INJUNCTIVE RELIEF IS OVERBROAD. ................. 28

CONCLUSION ................................................................................................................... 29

CERTIFICATE OF SERVICE

**INTRODUCTION**

Plaintiff American Federation of Government Employees ("AFGE") challenges an automated out-of-office email message put in place by the U.S. Department of Education ("Department") for employees who have been furloughed due to the ongoing lapse in appropriations, alleging that that automated message constitutes compelled speech in violation of the First Amendment. But AFGE's action fails for lack of subject-matter jurisdiction and on its merits. Summary judgment should be entered in Defendants' favor.

At the end of the day on September 30, 2025, appropriations for Fiscal Year 2025 lapsed. On October 1, 2025, federal agencies began taking actions to suspend or curtail their activities if they lacked further appropriations to fund government operations. At the Department, employees deemed nonessential were furloughed. Those furloughed employees were permitted four hours to conduct work that was necessary to ensure the orderly suspension of operations. Those activities included setting up automatic out-of-office email messages for the employees' government email accounts. The Department provided specific language for its employees to use for those out-of-office messages.

Later that day, the Department implemented an agency-wide change to all of the out-of-office emails. This message (or the "Original Message") was written in the first-person. Three business days later, the Department modified that agency-issued out of office message to the third-person (or the "New Message"), which reads:

> The Department employee you have contacted is currently in furlough status. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. The employee you have contacted will respond to emails once government functions resume.

1

The Department will maintain this message—which is written to convey a Departmental message on a Departmental medium—throughout the extent of the lapse in appropriations and will not revert to the original message.

AFGE is a labor union representing federal employees throughout the government, including employees at the Department.  It sued the agency and Linda McMahon, in her official capacity as Secretary of Education (collectively, "Defendants"), on October 3, 2025, challenging the Department's original out-of-office email message. It alleges that Defendants have violated the First Amendment by compelling agency employees to engage in political speech through their automated government out-of-office email responses. Although Defendants further revised the out-of-office email responses to remove the first-person language, AFGE nonetheless maintains that both emails violate the employees' rights against compelled speech.

This Court lacks jurisdiction over AFGE's First Amendment claim, and even if it had jurisdiction, AFGE's free speech claim fails on the merits. At the threshold, AFGE's claim falls outside of district court jurisdiction because these employment-related claims are precluded by the comprehensive and exclusive review provisions of the Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. § 7101 *et seq*., and the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq*. Under established Supreme Court and D.C. Circuit authority, AFGE cannot bypass that statutory review scheme and bring a constitutional claim before this Court.

This Court should also exercise its discretion and find that this case is prudentially moot as to the Original Message (and, because that is the only out-of-office message challenged in the Complaint, this lawsuit itself should be dismissed). The Department has already revised the email to remove any first-person language that might give the wrong impression that automatic

emails are from individual employees. The New Message will remain throughout the lapse in appropriations.  And any disputes about either message will become constitutionally moot when the messages are rescinded after the return of appropriations.

The challenge to the Original Message is essentially the crux of this lawsuit. Although AFGE maintains that the revised email still violates the First Amendment, the operative complaint only alleges harms from the original version of the out-of-office message.

Lastly, AFGE's First Amendment claim fails on the merits for multiple reasons. First, the free speech claim fails for the simple reason that it constitutes government speech contained in government email messages, and as such is not protected by the First Amendment. Second, Supreme Court doctrine on public employee speech forecloses AFGE's claim because such speech made in the course of an employee's official duties is likewise not protected.  Here, conveying Department drafted out-of-office messages as part of a lapse of appropriations is part of the employee's official duties.

For these reasons, this Court should deny AFGE's motion for summary judgment and grant Defendants' cross motion for summary judgment.

## BACKGROUND

### A.     Lapse in Appropriations

Appropriations for most federal agencies, including the Department, lapsed at the end of the day on September 30, 2025. *See* Forrester Decl. ¶ 3. During a lapse in appropriations, employees of the Department, as well as those of other federal agencies, are generally prohibited from working because no further financial obligations may be incurred in the absence of either a FY 2026 appropriation or a continuing resolution. Some Department employees are designated as "excepted" from the suspension of agency operations; employees who are non-excepted are furloughed. *Id*., Ex. A at 3–4.

3

On October 1, 2025, the first business day following the lapse, furloughed employees were permitted up to four hours to conduct activities to ensure an orderly suspension of operations pursuant to Department guidance. ECF No. 9-2, ¶¶ 6–7. According to that guidance, the Department directed employees to set up an automatic out-of-office email messages for their government email accounts, among other activities. Forrester Decl., Ex. A; *see also* ECF No. 9-2, ¶ 7.

Later in the day, the Department implemented the following Department-wide out-of-office message for its employees:

> Thank you for contacting me. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. Due to the lapse in appropriations I am currently in furlough status. I will respond to emails once government functions continue.

Forrester Decl. ¶ 5. On October 6, 2025, the Department revised the out-of-office messages to the following:

> The Department employee you have contacted is currently in furlough status. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. The employee you have contacted will respond to emails once government functions resume.

*Id*. ¶ 6. The Department intends to maintain that message during the pendency of the lapse in appropriations and will not revert to the previous message. *Id*. ¶ 7.

**B.    This Litigation**

On October 3, 2025, AFGE filed the instant Complaint, alleging that the Department violated the First Amendment rights of its furloughed employees because of the allegedly partisan content of its automatic out-of-office email messages regarding the lapse in appropriations. *See* ECF No. 1. The Complaint names, as defendants, the Department and Linda McMahon, in her official capacity as Secretary of Education. *Id*. ¶¶ 9–10. The Complaint

4

contains a single count under the First Amendment, alleging that "Defendants' co-opting of their employees' email correspondence to speak against their will on this matter of public concern violates employees' First Amendment rights to free speech and free association." *Id.* ¶ 48. The Complaint seeks declaratory and injunctive relief. *Id.* ¶¶ A–D (Prayer for Relief). Pertinently, the Complaint requests the Court to "[d]eclare unlawful and enjoin Defendants' modification of federal employees' out-of-office messages to include partisan political speech," *id.* ¶ A, and to "[i]ssue preliminary and permanent relief barring Defendants, their officers, employees, and agents from continuing to modify federal employees' out-of-office messages to include partisan political speech." *Id.* ¶ B.

That same evening, counsel for AFGE sent counsel for Defendants a letter demanding that the out-of-office message be changed or it would file a motion for a temporary restraining order. *See* ECF No. 9-1 at 6. On Monday morning, October 6, 2025, Defendants indicated that the Department had changed the out-of-office message to ensure that it no longer was framed in the first-person, in order to clarify that the message did not constitute the personal views of an individual employee. ECF No. 9-27; *see also* Forrester Decl. ¶ 6. Defendants further represented that the Department will not revert the out-of-office message to its original text during the pendency of the lapse in appropriations. ECF No. 9-27; *see also* Forrester Decl. ¶ 7.

Instead of seeking a TRO, on October 7, 2025, AFGE filed the instant Motion for Summary Judgment, ECF No. 9, and its Motion for an Expedited Briefing Schedule and for Relief From Standing Order No. 25-55, ECF No. 10. In its motion to expedite, AFGE requested this Court to lift the district-wide stay as to the instant case and to order an expedited briefing schedule for the summary judgment motion. *Id.* On October 9, 2025, this Court granted that

motion in part, lifting the stay and entering an expedited briefing schedule for AFGE's motion for summary judgment and Defendants' cross motion for summary judgment.

## LEGAL STANDARD

A court will grant summary judgment only if a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the court reviews all "evidence . . . in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245 n. 2 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation. *Id*. at 248–49. A non-material factual dispute is insufficient to prevent the court from granting summary judgment. *Id*. at 249.

On cross-motions for summary judgment "each side concedes that no material facts are at issue," although this applies "only for the purposes of [each side's] own motion" and does not mean that a "party [has] waive[d] the right to a full trial on the merits." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n. 4 (D.C.Cir.1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen*, *Local 201*, 170 F.3d 1111 (D.C.Cir.1999)); *see also Hodes v. U.S. Dep't of Treasury*, 967 F.Supp.2d 369, 373 (D.D.C.2013). The court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F.Supp.2d 63, 67 (D.D.C.2002) (citations omitted).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION.

Federal courts have limited jurisdiction, possessing only that power granted by the Constitution and authorized by Congress. *See generally Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). AFGE has failed to properly invoke this court's power here. This lawsuit is foreclosed by the exclusive administrative-judicial review schemes governing most federal employment disputes, which exclusively channel review of this dispute, on this posture, to other bodies, with Article III review available only after the completion of that administrative adjudication process.  And even if district court review were not implicitly precluded by those statutory schemes, review of the Department's automated out-of-office messages should be denied as prudentially moot.

### A.    District Court Jurisdiction Is Precluded Under The FSLMRS And The CSRA.

Although Congress has generally granted district courts original jurisdiction over civil actions arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, Congress has at times withdrawn such jurisdiction by specifically establishing an alternative statutory scheme for administrative and judicial review of a dispute. *See AFGE v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) ("Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."). Congress did so with respect to the employment-related First Amendment claim at issue in this lawsuit.

Before the late 1970s, federal employment law consisted of an "outdated patchwork of statues and rules." *United States v. Fausto*, 484 U.S. 439, 444 (1988). But in 1978, Congress responded by "comprehensively overhaul[ing]" and replacing that system with the CSRA, which regulates virtually every aspect of federal employment and "prescribes in great detail the

protections and remedies applicable" to employees. *Id.* at 443. The CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (1978), which includes the FSLMRS for federal labor-management relations, 5 U.S.C. §§ 7101–35, sets out an "integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Fausto*, 484 U.S. at 445; *AFGE*, 929 F.3d at 752; *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004). Under those statutes, labor disputes involving unions are generally adjudicated by the Federal Labor Relations Authority (FLRA), while disputes regarding individual civil servants are generally adjudicated by the Merit Systems Protection Board (MSPB). *AFGE*, 929 F.3d at 752; *Fausto*, 484 U.S. 439, 445–47. FLRA decisions "are subject to direct review in the courts of appeals," *AFGE*, 929 F.3d at 752, and MSPB decisions generally are reviewed by the Court of Appeals for the Federal Circuit. *Graham*, 358 F.3d at 934.

"[W]hen Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems," those procedures are generally intended "to be exclusive." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted). As a result of the highly reticulated scheme set forth in the CSRA, the Supreme Court has held that it provides the exclusive means of addressing federal employment disputes. *Fausto*, 484 U.S. at 445; *see also Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) ("[W]hat you get under the CSRA is what you get."). That is equally true for constitutional challenges arising out of federal employment. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11–15 (2012). The Supreme Court has described this scheme as an "implied preclusion of district court jurisdiction." *Id.* at 12.

The above principles establish that the FSLMRS and the CSRA preclude AFGE's First Amendment claim.

**1.** With the FSLMRS, as with the rest of the CSRA, "Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector," along with mechanisms for resolving federal labor disputes. *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013). Principally, the FSLMRS grants federal employees collective-bargaining rights, requiring that unions and federal agencies negotiate over certain matters. 5 U.S.C. §§ 7702(2), 7106, 7114. At the same time, the FSLMRS also channels adjudication of labor disputes to the FLRA, followed by direct review in the court of appeals. *See* 5 U.S.C. §§ 7105(a)(2), 7123(a). The FSLMRS's "regime is exclusive," and a union "cannot circumvent [it] by instead bringing suit in district court." *Air Force*, 716 F.3d at 636–37; *see also id.* at 638 ("The FSLMRS provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims.").

The FSLMRS precludes this Court's jurisdiction over AFGE's claim unless that claim is not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE*, 929 F.3d at 755 ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope."). In determining whether the claims presented here fit within the statutory review scheme, the Court must consider whether "a finding of preclusion could foreclose all meaningful judicial review," whether the claims are "wholly collateral" to the FSLMRS's review provisions, and whether claims are "outside the [FLRA's] expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212–13 (quotation marks omitted). "The ultimate question is how best to understand what Congress has

done—whether the statutory review scheme . . . reaches the claim in question." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023).

Each of the three *Thunder Basin* factors weighs in favor of determining that AFGE's claim is precluded. First, requiring AFGE to proceed through the statutory review would not foreclose all meaningful judicial review. Specifically, AFGE can litigate its First Amendment claim through the statutory scheme through "a grievance resolution and arbitration procedure that the FSLMRS requires in every collective bargaining agreement." *Air Force*, 716 F.3d at 636–37. The statute defines "grievance" broadly to include a complaint "by any employee, labor organization, or agency concerning . . . any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *See id*. at 637 n.4 (quoting 5 U.S.C. § 7103(a)(9)(C)(ii)). "Unless a specific statutory or contract exception applies, that procedure is 'the exclusive administrative procedure [] for resolving grievances which fall within its coverage.'" *Id*. (citing 5 U.S.C. § 7121(a)(1)). After arbitration, either party may file with the FLRA exceptions to an arbitrator's award. *Id*. (citing 5 U.S.C. § 7122(a)). The FLRA reviews the award to ensure that it is not "contrary to any law, rule, or regulation" or otherwise deficient on any ground "similar to those applied by Federal courts in private sector labor-management relations." *Id*. AFGE alleges that "the Department's injection of partisan political opinions into out-of-office messages violates employees' First Amendment rights against compelled speech." ECF No. 9-1 at 10. "Such an allegation easily falls within the definition of a 'grievance' under the FSLMRS and thus can be challenged using collective bargaining agreement grievance and arbitration procedures." *Air Force*, 716 F.3d at 637. Indeed, the Complaint is explicit on this point, claiming that the out-of-office messages were inappropriate conditions imposed on their employment responsibilities. *E.g.* ECF No. 1 ¶¶ 3, 38,

45. "The FSLMRS does not, however, authorize the [content of government email messages] to be challenged by way of a lawsuit begun in district court." *Id*. at 638.

Moreover, the FSLMRS's grievance procedures provides review for employees allegedly "affected by a prohibited personnel practice . . ." 5 U.S.C. § 7121(g)(2). The CSRA enumerates actions that constitute "prohibited personnel practices" under 5 U.S.C. § 2302. Under Section 2302, such prohibited personnel practices include actions to "coerce the political activity of any person . . ." 5 U.S.C. § 2302(b)(3); *see Fausto*, 484 U.S. at 446 (observing that the CSRA "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, *coercion of political activity*, nepotism, and reprisal against so-called whistleblowers.") (emphasis added). Under 5 U.S.C. §§ 7121(g)(2)–(3), aggrieved employees may elect one of the following remedies: (1) an appeal to the MSPB; (2) a negotiated grievance procedure, as discussed above; or (3) "[p]rocedures for seeking corrective action under subchapters II and III of chapter 12," which refers, in relevant part, to complaints to the Office of Special Counsel ("OSC"). *See* 5 U.S.C. §§ 7121(g)(3), 1214(a). The OSC is empowered to investigate and address constitutional claims, *see id.* §§ 2301(b)(2), 1214(a)(1)(A), and may prosecute claims before the MSPB, 5 U.S.C. § 1214(b)(2). Whatever the route, the remedies set forth under the grievance procedures of the FSLMRS provide for judicial review over employee claims. FLRA decisions "are subject to direct review in the courts of appeals." *AFGE*, 929 F.3d at 752 (citing 5 U.S.C. § 7123(a), (c)). MSPB decisions—whether sought directly under Section 7121(g)(3)(A) or following OSC proceedings under Section 7121(g)(3)(C)—can be reviewed specifically by the Court of Appeals for the Federal Circuit. 5 U.S.C. §§ 1214(c), 7703(b). As the D.C. Circuit held in *AFGE*, "[r]equiring the unions here to proceed through the FSLMRS's scheme does not foreclose 'all meaningful judicial review.'" 929 F.3d at 759. In fact, the

FSLMRS provides several options for administrative review—and eventual judicial review—of AFGE's First Amendment claim. "Such review, according to *Thunder Basin*, *Air Force*, and *Loy*, qualifies as meaningful." *Id*.

Second, AFGE's claim is not wholly collateral to the FSLMRS's statutory review scheme. On the contrary, the allegation that the Department violated the First Amendment by compelling partisan speech is in the heartland of FSLMRS review because such a complaint is expressly reviewable under the grievance procedures for adjudicating a claim that the agency engaged in a prohibited personnel practice by coercing political activity. *See* 5 U.S.C. §§ 7121(g)(1)– (4), 2302(b)(3). And the remedies AFGE seeks—declaring unlawful and enjoining Defendants from modifying the out-of-office-messages to include partisan political speech—is precisely the type of relief that it can obtain through the statutory scheme. *See AFGE*, 929 F.3d at 760 ("[T]he unions could ask the district court for the same relief that they could ultimately obtain through the statutory scheme . . ."). AFGE's challenge is, therefore, "of the type that is regularly adjudicated through the FSLMRS's scheme," *AFGE*, 929 F.3d at 760, not "wholly collateral" to it. *See Elgin*, 567 U.S. at 22.

Third, AFGE's claim is not beyond the expertise of the FLRA or the MSPB. Again, Congress has specifically set up procedures for adjudicating grievances, including those involving the sort of prohibited personnel practice alleged here. The FLRA or the MSPB could also bring its expertise to bear on the factual issues that may be presented in this case; after all, the FLRA and MSPB adjudicate claims of First Amendment violations in the labor context. *See Independent Union of Pension Emps. For Democracy & Just. v. Pension Benefit Guar. Corp.*, 68 F.L.R.A. 999, 1014 (2014). In other words, the FLRA or the MSPB's familiarity with such employment matters "is thus more than 'helpful background knowledge.' . . . It is expertise that

goes to the core issues in this case." *AFGE*, 929 F.3d at 760; *see also Elgin*, 567 U.S. at 22–23 (noting that "preliminary questions unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers.").

The *Thunder Basin* factors decisively weigh in favor of determining that AFGE's claim is precluded by the FSLMRS. Indeed, this Court reached a substantially similar conclusion in *National Treasury Employees Union v. Trump*, 770 F. Supp. 3d 1, 7–11 (D.D.C. 2025).

**2.** Even outside the union context of the FSLMRS, jurisdiction over AFGE's claim in this posture is separately foreclosed by the CSRA. Again, AFGE alleges that the Department is "[f]orcing civil servants to speak on behalf of the political leadership's partisan agenda" in "blatant violation of federal employees' First Amendment rights." ECF No. 1, ¶ 2. But as do the FSLMRS's grievance procedures, the CSRA expressly provides administrative review of exactly that sort of personnel dispute by setting up procedures for adjudicating claims of prohibited personnel practices under 5 U.S.C. § 2302, specifically alleged actions by the agency to "coerce the political activity of any person . . ." *Id*. § 2302(b)(3); *see Fausto*, 484 U.S. at 446 (observing that the CSRA "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, *coercion of political activity*, nepotism, and reprisal against so-called whistleblowers.") (emphasis added). And "[a]n employee faced with a prohibited personnel practice must first complain to the [OSC]." *Krafsur v. Davenport*, 736 F.3d 1032, 1034 (6th Cir. 2013). From there, OSC "*may* refer the case to the [MSPB] (from which the employee may appeal to the Federal Circuit)." *Id*. (citing §§ 1214(b)(2)(C), 1214(c) (emphasis in original)). Consequently, because the CSRA provides the exclusive means of addressing federal employment disputes and "spells out in painstaking detail the path an employee must follow if he

wants to challenge a prohibited personnel practice," *id*. at 1037, AFGE "may not evade this result by artful pleading—by taking a core prohibited personnel practice covered by § 2302 and dressing it up as a constitutional claim," *id*. at 1039; *see Elgin*, 567 U.S. at 17 ("[I]t is 'fairly discernible' from the CSRA that Congress intended covered employees appealing covered agency actions to proceed exclusively through the statutory review scheme."); *see also Richards v. Kiernan*, 461 F.3d 880, 885 (7th Cir. 2006) ("There is no question but that the CSRA provides the exclusive remedy for an alleged constitutional violation (including an alleged First Amendment violation) arising out of federal employment.").

AFGE resists this conclusion. It asserts that the CSRA "pose[s] no barrier to this suit" because it "is not alleging any personnel-related claim that would be subject to the CSRA's review scheme." ECF No. 9-1 at 18. Rather, according to AFGE, it "is alleging the opposite: that the government is violating its members' First Amendment rights by compelling speech beyond the scope of their employment." *Id*. That contention is meritless. For one thing, "[t]he salient fact" is that AFGE's claim "ar[i]se[s] out of [the] federal employment relationship." *Hall v. Clinton*, 235 F.3d 202, 205 (4th Cir. 2000). That is necessarily true—AFGE's members' email addresses are work email accounts provided by agency systems, and the out-of-office message at issue was centrally placed by the Department itself. Forrester Decl. ¶ 4–5. There would be no dispute if not for the fact that AFGE's members and the Department are in an employment relationship. For another thing, as discussed above, the CSRA explicitly covers AFGE's claim that the Department has violated its employees First Amendment rights by compelling partisan speech because actions to "coerce political activity" is a prohibited personnel practice under 5 U.S.C. § 2302(b)(3). Accordingly, "[t]he [CSRA] leaves no doubt that an employee who believes that a prohibited personnel practice has occurred must take his complaint to the [OSC], not a

district court, even if he contends that the practice violates the Constitution." *Krafsur*, 736 F.3d at 1039.

Next, AFGE contends that the D.C. Circuit has held that "the CSRA's exhaustion requirement does not apply to constitutional claims 'seeking declaratory and injunctive relief' that 'stand[] independently' of any claim under the CSRA." ECF No. 9-1 at 18 (citing *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996)). But AFGE's reliance on *Weaver* is misplaced for two reasons. First, in *Weaver*, the D.C. Circuit held that when a constitutional claim was "intertwined" with a CSRA claim that it was precluded from being brought in the district court by the CSRA. *Weaver*, 87 F.3d at 1434; *see id.* at 1434–45 ("The exhaustion requirement generally applies as well to claims arising directly under the Constitution (such as [plaintiff's] claim for declaratory and injunctive relief from the prepublication review requirement) when such claims are 'premised on the same facts' as the plaintiff's CSRA claims and 'the CSRA remedy would have been fully effective in remedying the constitutional violation.'"). That is why in *Weaver*, the Court allowed a freestanding facial challenge to agency prepublication review provisions—even though it rejected a similar challenge in the context of a specific employee's dispute. *Id.* But here, there is no free-standing challenge akin to *Weaver*; rather the dispute is entirely fact-specific to a particular context that is otherwise channeled to the CSRA. Second, even if *Weaver* is not distinguishable, the conclusion in *Weaver* is substantially foreclosed by the Supreme Court's later decision in *Elgin*, which decisively held that the CSRA precludes facial constitutional claims for covered employees. *Elgin*, 567 U.S. at 12–13. Indeed, following *Elgin*, the D.C. Circuit held that constitutional challenges, including First Amendment claims, are no less subject to preclusion under a comprehensive review scheme than any other claim. *See AFGE*, 929 F.3d at 753–54.

15

AFGE also cites *Turner v. Agency for Global Media*, 502 F. Supp. 3d 333, 366–67 (D.D.C. 2020) for the proposition that "where a case does not challenge a change to 'working conditions' within the meaning of the statute, a constitutional claim may be brought directly in district court, without CSRA exhaustion." ECF No. 9-1 at 19. That assertion fares no better. For starters, AFGE relies on an overly broad reading of *Turner*. Where the Supreme Court has recognized that "[t]he CSRA established a *comprehensive* system for reviewing personnel action taken against federal employees[,]" *Fausto*, 484 U.S. at 454 (emphasis added), of course CSRA review is not limited *solely* to claims involving changes in "working conditions," as AFGE suggests. On top of that, the determination about whether the CSRA precludes jurisdiction over AFGE's First Amendment challenge does not hinge on any change in "working conditions" under 5 U.S.C § 2302(a)(2)(A)(xii). Rather, as discussed, AFGE's allegations concern a prohibited personnel practice—actions by Defendants to "coerce the political activity" of its members under § 2302(b)(3)—that the CSRA channels to OSC, or directly to the MSPB under FSLMRS's grievance procedures. *See* §§ 1214(a)(1)(A), 7121(g)(3)(A). In short, *Turner*—a case that the court itself acknowledged as "*sui generis*," 502 F. Supp. 3d at 367—has nothing to do with whether CSRA preclusion applies here.

Lastly, AFGE retreats, acknowledging that OSC and the MSPB are "the two administrative bodies that would even arguably hear Plaintiff's claims . . ." ECF No. 9-1 at 20. But as a last ditch against CSRA preclusion, AFGE argues that because OSC and the MSPB "are both shut down" due to the lapse in appropriations, *id*., "[t]here is no way for Plaintiff to receive meaningful review other than through this Court's jurisdiction." *Id*. at 21. But this argument is a nonstarter. Courts have repeatedly recognized that matters covered by exclusive regimes like the CSRA must be channeled through those administrative procedures even when the statutory

review process is not capable of providing immediate or complete relief. *See*, *e.g.*, *AFGE*, 929

F.3d at 756 ("[S]o long as [a union] can eventually obtain review and relief' of their legal

challenge by raising it through the procedures available, the challenge may not be brought in

district court in the first instance."); *Jolley v. United States*, 549 F. Supp. 3d 1, 6 (D.D.C. 2021)

(finding "no basis, statutory or otherwise, to say that a court's subject matter jurisdiction can turn

on the presence or absence of political gridlock."). Indeed, AFGE's argument here is essentially

no different from the one it made in *Air Force*, which the D.C. Circuit rejected. 716 F.3d at 639

("Similarly, we reject AFGE's argument that the district court has jurisdiction because it can

more efficiently adjudicate AFGE's claim . . ."). While "[t]hese procedures surely lack the

directness and immediacy of" relief upon review by this Court, "the choice of procedures lie with

Congress[.]" *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1014 (D.C. Cir. 2009) (citations

omitted)). The upshot is AFGE cannot "avoid the CSRA because it provides only an

'inconvenient' remedy." *Air Force*, 716 F.3d at 639.

Thus, AFGE's claim must be pursued, if at all, through the exclusive review schemes

provided by Congress.

> **B.      AFGE's Challenge To The Original Out-Of-Office Message Is**
> **Prudentially Moot And Any Challenge As To The New**
> **Message Is Not Properly Pled In The Complaint.**

As the D.C. Circuit has recognized, the doctrine of mootness has "two distinct branches."

*Chamber of Com. v. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980). The first branch is

"grounded in the jurisdictional limitations dictated by the Constitution: Under Article III, a

federal court is without power to act unless it is presented with a live 'case or controversy.'" *City

of New York v. Baker*, 878 F.2d 507, 509 (D.C. Cir. 1989) (citations omitted). The second branch

is often termed "prudential mootness." *Id*. It "does not concern [the] [C]ourt's power to grant

17

relief, but rather its exercise of discretion in the use of that power." *Id*. "Where it is so unlikely that the court's grant of [remedy] will actually relieve the injury," *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991), the court has discretion to "stay its hand, and to withhold relief it has the power to grant," *Chamber of Com*., 627 F.2d at 291. "Prudential mootness concerns often arise when a defendant has ceased its allegedly illegal conduct and is reconsidering or has reconsidered the policy that created the harm in the first place." *Conservation Law Foundation v. Pritzker*, 37 F. Supp. 3d 254, 264 (D.D.C. 2014); *see Chamber of Com*., 627 F.2d at 291. Put simply, "[w]hile injunctive relief could hypothetically prevent future harm in such circumstances, in reality it would serve little purpose. . . . Where injunctive relief would likely have no impact, a court is free to stay its hand." *Conservation Law Foundation*, 37 F. Supp. 3d at 264.

Here, this Court should exercise its discretion and resolve AFGE's claim as it relates to the first out-of-office message (the only one it actually challenges in the Complaint) as prudentially moot. In its Complaint, AFGE alleges that "[t]he language in the [Department] out-of-office email responses is written as if the individual employee were speaking in the first person, suggesting that the language should be ascribed to the employee." ECF No. 1, ¶ 46. On AFGE's theory, this is compelled, partisan speech that violates the First Amendment because "the messages plainly purported to speak in the employee's voice." ECF No. 9-1 at 16. But as AFGE acknowledges, on October 6, 2025, Defendants modified the automatic email "by revising the out-of-office message to remove the first-person language." ECF No. 9-1 at 11. The revised message adequately resolves any plausible allegation of compelled speech because it clarifies that the content conveys a message by the Department and not a message from any individual

employee. In other words, the new message mitigates the specter that "the Department is forcing words into its employees' mouths . . ." ECF No. 9-1 at 14.

Although AFGE maintains that the current version of the out-of-office message still violates the First Amendment, ECF No. 9-1 at 10, consideration of prudential mootness is warranted here because, in large part, "[D]efendant[s] ha[ve] ceased its allegedly illegal conduct . . . that created the harm in the first place" and any injunctive relief by this Court "would serve little purpose." *Conservation Law Foundation*, 37 F. Supp. 3d at 264; *United Spinal Ass'n, Inc. v. O'Malley*, No. 20-CV-2236 (TSC), 2024 WL 3400259, at *10 (D.D.C. July 11, 2024) ("A court may abstain under this doctrine in suits for declaratory or injunctive relief where the defendant 'clearly . . . modified their behavior significantly since the suit was brought,' such that 'the likelihood of recurrent confrontations . . . is much too small to warrant' a decision.") (quoting *Cmty. for Creative Nonviolence v. Hess*, 745 F.2d 697, 701 (D.C. Cir. 1984)). That is particularly true since Defendants have represented that they would not revert to the original email during the pendency of the lapse in appropriations. Forrester Decl. ¶ 7; *cf. United Spinal Ass'n, Inc*., 2024 WL 3400259, at *10 ("That declaration is sufficient to confer Article III jurisdiction because of the voluntary cessation doctrine, which only renders a case moot if a defendant completely or irrevocably eradicated the effects of the alleged violation but not to avoid prudential mootness.") (cleaned up)). Furthermore, if this case becomes constitutionally moot upon the end of the lapse, that is yet another reason to refrain from exercising its equitable powers in this case. *Cf. Gordon v. Holder*, 85 F. Supp.3d 78, 84 (D.D.C. 2015) ("These circumstances present the sort of situation where a court should stay its hand. For the reasons already stated, it is wholly speculative that granting the requested equitable relief would 'actually relieve the injury' Gordon alleges.").

As for the revised out-of-office message, the Complaint contains no factual allegations regarding it at all. Because the second message does not appear in the Complaint, it cannot be a basis for a judgment on the merits. *Steele v. United States*, 657 F. Supp. 3d 23, 48 (D.D.C. 2023) ("New claims cannot be pled in summary judgment briefs."). This Court should, therefore, not entertain AFGE's argument regarding the revised out-of-office message.

Thus, this Court should conclude that AFGE's First Amendment challenge against The Department's first out-of-office messages is prudentially moot and the challenge to the second message is not properly presented.

## II.    THE DEPARTMENT'S OUT-OF-OFFICE MESSAGES ARE NOT PROTECTED UNDER THE FIRST AMENDMENT.

Even if the out-of-office messages were reviewable, they do not violate the First Amendment.  It is axiomatic that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). And it is also "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (internal quotation marks and citations omitted).  But the First Amendment's Free Speech Clause does not apply to the government's own speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *see also id*. at 464 ("the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause").

A government entity may "speak for itself," and "select the views that it wants to express." *Id*. at 467–68 (cleaned up). "Even political discrimination is allowed when the government chooses to sponsor speech." *Raven v. Sajet*, 334 F. Supp. 3d 22, 32 (D.D.C. 2018), *aff'd sub nom*. *Raven v. United States*, No. 18-5346, 2019 WL 2562945 (D.C. Cir. May 17,

2019); *see also PETA v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) ("we can see no First Amendment problem with the Commission making arbitrary or viewpoint-based decisions about which donkeys and elephants it wanted in its parade. No one could plausibly argue that an Inauguration Parade has to have balance, or that the losing Presidential candidate must—if he requests—be allowed to have a float of his own."). "So aside from a few limited exceptions, offensive speech by the government is cured at the ballot box, not in the courtroom." *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 21 (D.D.C. 2021).

In determining whether to apply the government speech doctrine, the Supreme Court has looked to "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech." *Pulphus v. Ayers*, 249 F.Supp.3d 238, 247 (D.D.C. 2017) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–14; *Summum*, 555 U.S. at 470–72)).

Here, the out-of-office emails constitute government speech and are, therefore, not subject to the First Amendment. At the outset, the purpose of the out-of-office messages—which come from government email addresses—is to inform email correspondents about the lapse in appropriations and the employee's work status. Forrester Decl. ¶¶ 5–6. Those are both government messages; they are not private messages conveying information on the employee's personal behalf. *Id*.

That AFGE criticizes the Department for directly inserting "partisan political speech" into the out-of-office email messages, ECF No. 9-1 at 9, is of no moment because government speech frequently contains political messages. Indeed, Judge McFadden, along with other judges in this district, determined that the "Black Lives Matter" mural, which was commissioned by the

District of Columbia at Mayor Bowser's direction, was government speech even though "the [m]ural appears as the Mayor wants it to appear, communicating a *political message* from the District." *Penkoski*, 548 F. Supp. 3d at 25 (emphasis added); *see*, *e.g.*, *Small Bus. in Transportation Coal.* ("*SBTC*") v. *Bowser*, 610 F. Supp. 3d 149, 153–57 (D.D.C. 2022), *aff'd*, No. 22-7102, 2023 WL 2770986 (D.C. Cir. Apr. 4, 2023); *Judicial Watch v. Bowser*, 590 F.Supp.3d 1, 6–10 (D.D.C. 2022). Those cases show that whether the Department's out-office-email response messages constitute government speech does not turn on their political or controversial content, but on the entity on whose behalf the message is conveyed—and here, that is the Department.

Consideration of the *Walker-Summum* factors confirms that the out-of-office emails constitute government speech. First, "[w]hile 'not a prerequisite,' courts 'have recognized that a medium that has long communicated government messages is more likely to be government speech.'" *Penkoski*, 548 F. Supp. 3d at 22 (quoting *Pulphus*, 249 F. Supp. 3d at 247); *see also Mech v. School Bd. Of Palm Beach Cty, Fla.*, 806 F.3d 1070, 1076 (11th Cir. 2015) ("a long historical pedigree is not a prerequisite for government speech."). Here, the out-of-office messages are official government email, which are "quintessentially governmental channels" for communicating its messages. *SBTC*, 610 F. Supp. 3d at 154. This is not, for example, a government employee using a private social media service to post a mix of personal and official materials, *see, e.g.*, *Lindke v. Freed*, 601 U.S. 187 (2024), this is a government owned and operated email account delivering a government drafted message related to the government employee's official working status. Forrester Decl. ¶¶ 4–6.

Second, the public, including recipients of the out-of-office messages, would reasonably assume the automated emails conveying standardized messages are endorsed by the government.

AFGE makes much of the fact that the original version of the email is written in the first person

and the revised version "is still sent from an individual email account associated with an

individual speaker." ECF No. 9-1 at 16. But that misses the point. Email from an individual

employee using a government email address is generally used for official agency business. *See*

Forrester Decl. ¶ 4. AFGE, for its part, substantially concedes this point by acknowledging that

Department "employees regularly use their government email addresses to communicate with

external stakeholders like school district representatives, college administrators, parents,

students, vendors, and other members of the public." ECF No. 9-2, ¶ 17. Those communications

happen in those employees' official capacity. Moreover, AFGE does not provide evidence—

beyond hearsay speculation—that members of the public would assume that such messages are,

in fact, conveying the personal views of employees rather than the views of the government. For

example, one declarant speculates, "[b]oth the earlier and revised versions of the partisan out-of-

office messages thus have the potential to affect my professional reputation with any persons

who attempt to reach me." ECF No. 9-6, ¶ 11. And another declarant theorizes, "I am concerned

that individuals who email me in the coming days or weeks will think that I decided to draft the

automatic reply with a partisan message . . . , which makes me appear unprofessional . . . I fear

this will damage professional relationships that I have taken years to build." ECF No. 9-8, ¶ 12.

That lack of evidence, on its own, is fatal to AFGE's summary judgment motion. *Cf. Bortell v.*

*Eli Lilly & Co.*, 406 F.Supp.2d 1, 11 (D.D.C. 2005) (The "general rule is that 'hearsay evidence

cannot be considered on a motion for summary judgment.'").  Moreover, the operative out-of-

office message is framed without any reference to the first person; it is written to come from the

agency itself.  ECF No. 9-2, ¶ 18.  AFGE's argument on this point thus collapses into a claim

that any email from a government email account will be seen to be viewed as the personal speech of that employee.  There is no basis for this overbroad and unsupported assertion.

Third, the Department maintains control over the out-of-office messages of its employees. Notably, AFGE does not dispute this. By AFGE's own telling: the Department's Chief Human Capital Officer instructed furloughed employees to perform "orderly shut down activities," ECF No. 9-2, ¶¶ 6–7; Those activities included setting up automatic out-of-office email messages, *id*. ¶ 7; The Chief Human Capital Officer further directed the contents of those out-of-office messages, *id*. ¶ 8; the Department later modified its employees' out-of-office messages to include the language that AFGE now challenges; *id*. ¶ 9; then, finally, on October 6, 2025, the Department modified the out-of-office messages again, removing the first-person language; *id*. ¶ 18. These facts, therefore, show that the Department "maintains direct control over the messages conveyed" in the out-of-office messages at issue in this case. *Walker*, 576 U.S. at 213.

Thus, all three factors of the *Walker-Summum* test favor a finding of government speech.

AFGE insists that the out-of-office messages are subject to the First Amendment. But it all but ignores the government speech doctrine. It mentions government speech only once in passing, ECF No. 9-1 at 16, and conducts no analysis of the *Walker-Summum* factors.

Instead of grappling with the government speech doctrine, AFGE "spill[s] much ink debating whether" the out-of-office messages were part of the Department employees' "official duties." *LeFande v. District of Columbia*, 841 F.3d 485, 494 (D.C. Cir. 2016) (citation omitted). AFGE declares that "[t]he partisan political rhetoric the Department added to employees' out-of-office messages is plainly not speech within the employees' official duties." ECF No. 9-1 at 13. But this reframing misses the boat—it is the obligation to convey an out-of-office message

during a lapse that is indisputably within the official duties of the government; and employees do not have a right to choose their own preferred message when communicating from their official accounts about official government status. Forrester Decl., Ex. A at 5–6.

Fundamentally, AFGE's attempts to distort the Supreme Court's First Amendment precedent in this area. In *Garcetti*, the Supreme Court considered whether a public employee's speech was entitled to constitutional protection. *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006). It explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Put another way,

> [e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. . . . [But] [w]hen a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees.

*Id*. at 424. The Supreme Court later reaffirmed this principle in *Janus*, recognizing that "[m]any employees, in both the public and private sectors, are paid to write or speak for the purpose of furthering the interests of their employers[,]" and "in general when public employees are performing their job duties, their speech may be controlled by their employer." 585 U.S. at 909–10. Those cases, therefore, confirm that the Department's out-of-office messages, which constitute the agency's official communications, do not implicate any of the employees' First Amendment rights. That is because any speech in the Department's out-of-office messages is "speech that owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 411. It is undisputed that the Department instructed its furloughed employees to set up out-of-office messages and dictated the contents of those emails. ECF No. 9-2, ¶¶ 6–8. Department employees, in turn, carried out tasks "to perform orderly shutdown activities," *id*. ¶

25

7, in the course of their job duties. Pertinently, *Garcetti* recognized that such ad hoc or de facto duties can fall within the scope of an employee's official job responsibilities despite not appearing in any written job description. *See* 547 U.S. at 424–25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes"). Perhaps a different First Amendment result would attend if, as the Supreme Court suggested in *Garcetti*, the Department employees were engaged in something akin to "writing a letter to a local newspaper or discussing politics with a coworker." *Id*. at 423 (cleaned up). But establishing an out-of-office message during a lapse in appropriations is undeniably a part of the employees' job responsibilities. And it matters not, for First Amendment purposes, that the Department later unilaterally changed the out-of-office messages because, with respect to those messages, "the employee's words are really the words of the employer" and "[t]he employee is effectively the employer's spokesperson." *Janus*, 585 U.S. at 910. Indeed, the fact that the Department itself imposed those requirements makes clear that these messages are the agency's speech.

Any other rule—particularly the one that AFGE proposes here—would "constitutionalize the employee grievance" and risk creating "a constitutional cause of action [for] every statement a public employee makes in the course of doing his or her job." *Garcetti*, 547 U.S. at 420, 426. That would be intolerable as it "would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business." *Id*. at 423. If AFGE and its members had it their way, "government would not work." *Walker*, 576 U.S. at 207.

26

And to the extent "public employees are being compelled to say things that they reasonably believe to be untrue or improper[,]" *Janus*, 585 U.S. 909–10—as AFGE alleges here—the Supreme Court disclaimed protection from the First Amendment, pointing instead to various "obligations arising from any other applicable constitutional provisions and mandates of the criminal and civil laws [to] protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." *Garcetti*, 547 U.S. at 425–26. Along those lines, AFGE invokes the Hatch Act, one such law "aimed to *protect* employees' rights . . . to free expression . . ." *Guffey v. Mauskopf*, 45 F.4th 422, 451 (D.C Cir. 2022). But that invocation suggests that this case is truly a Hatch Act complaint dressed up as a First Amendment challenge. AFGE even appears to improperly invite this Court to opine on whether the Department's out-of-office messages constitute a Hatch Act violation under the guise of considering whether partisan speech can be part of a government employee's official duties. *See* ECF No. 9-1 at 13–16 ("the Hatch Act makes the lawfulness of the message questionable at best."). Any such inquiry is for OSC to resolve, and this Court should decline to take that up here. *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 131 (D.D.C. 2020) ("CREW can freely bring allegations of Hatch Act violations to OSC's attention.").

Lastly, AFGE alternatively suggests that the *Pickering* balancing test might yield a different result. ECF No. 9-1 at 15–17. But it rightly acknowledges that *Pickering* "fits much less well where the government compels speech rather than restricts speech." *Id*. at 14 (quoting *Janus*, 585 U.S. at 905). Indeed, the Supreme Court has remarked that "we have previously taken a dim view of similar attempts to recast problematic First Amendment decisions." *Janus*, 585

U.S. at 906. There is, therefore, "no good reason, at this late date, to try to shoehorn [this case] into the *Pickering* framework." *Id.*

In sum, the contents of the out-of-office messages constitute government speech and are therefore not subject to the First Amendment. To the extent AFGE "disagrees with [the Department's] chosen message or wishes that [it] would adopt and express its own preferred message, it must utilize political channels, rather than the courts, to express its views." *SBTC*, 610 F. Supp. 3d at 156–57.

## III.    AFGE'S REQUESTED INJUNCTIVE RELIEF IS OVERBROAD.

Finally, AFGE's proposed injunction is overbroad. In essence, it seeks agency-wide relief. But as the collective bargaining representative of its members, it represents only a smaller subset of employees at the Department. Such a request is in tension with the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). There, the Supreme Court held that injunctions "asserting the power to prohibit enforcement of a law or policy against anyone . . . likely exceed the equitable authority that Congress has granted to federal courts." *Id.* at 2548. It directed the lower courts that had issued the preliminary injunctions in question to "move expeditiously" to make their injunctions "[no] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 2562–63. And it specifically rejected the attempt to use broad injunctions as a substitute for properly certified class actions: "[B]y forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions circumvent Rule 23's procedural protections and allow 'courts to create de facto class actions at will.'" *Id.* at 2555. AFGE is apparently seeking such a shortcut here.  Accordingly, any relief should be limited to AFGE's members only.

## CONCLUSION

For the foregoing reasons, this Court should deny AFGE's motion for summary judgment and grant Defendants' cross motion for summary judgment.

Dated: October 16, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *James J. Wen*
JAMES J. WEN
Trial Attorney,
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 598-7361
E-mail: james.j.wen@usdoj.gov

*Counsel for Defendants*

29

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, on October 16, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *James J. Wen*__</u>
JAMES J. WEN