**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-3553-CRC |
| U.S. DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary of Education, | |
| Defendants. | |

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

I.     Plaintiff's claim is not subject to administrative channeling. ............................... 2

      A.    Congress did not intend to preclude district-court jurisdiction over Plaintiff's challenge to shutdown conduct because the CSRA's review mechanisms are entirely unavailable during the shutdown............................................................. 3

      B.    Plaintiff's claim is not of the type that Congress intended to be reviewed under the CSRA.................................................................................................................. 6

II.    This case is not prudentially moot. .................................................................... 11

III.   Compelling Department employees to speak a partisan political message violates the First Amendment........................................................................................................ 15

IV.   The Court should enter declaratory and injunctive relief. ................................. 23

CONCLUSION ............................................................................................................... 23

## INTRODUCTION

The Department of Education admits that it changed furloughed employees' out-of-office messages to blame "Democrat Senators" for the government shutdown and that the employees' email accounts still send those messages in response to incoming email. The Department is violating individual employees' First Amendment rights by co-opting those employees' speech in an effort to tilt a public political debate in the Trump Administration's favor.

The Department attempts to avoid a judicial ruling on the unlawfulness of its actions by arguing that Plaintiff is impliedly precluded from proceeding in federal court. But a challenge to government conduct that will last only for the duration of the shutdown cannot be administratively channeled to agencies that are themselves shut down. As to the Department's other threshold defense, the Department's tweaking of the out-of-office messages after this lawsuit was filed, while leaving the partisan language in place, does not cure the constitutional defect and does not moot Plaintiff's claim. On the merits, there is no dispute that partisan political messaging is outside the scope of Department employees' job duties. The messages are thus unlawfully compelled individual speech rather than government speech and are accordingly subject to the First Amendment.

The Court should enter declaratory and injunctive relief to remedy the Department's unlawful use of nonpartisan civil servants as unwilling political messengers.

## ARGUMENT

Neither of the Department's threshold defenses precludes judicial review. Plaintiff was not required to bring its claim in an administrative channel, particularly because Plaintiff is challenging conduct that is causing irreparable First Amendment injury and that will persist only for precisely as long as administrative review is unavailable. *See* Section I. Nor is Plaintiff's

claim mooted by the Department's change to the out-of-office messages, which leaves in place the partisan political language. *See* Section II.

On the merits, it is not within the official job duties of Department of Education employees to convey political opinions about the cause of the shutdown. The out-of-office messages are not government speech that escapes the reach of the First Amendment. Instead, the messages are coerced individual speech that violate the First Amendment. *See* Section III. Finally, the Department does not dispute that a declaratory judgment and permanent injunctive relief are appropriate in this case, and the Court should ensure that its judgment affords complete relief. *See* Section IV.

## I.    Plaintiff's claim is not subject to administrative channeling.

The Department argues that the Civil Service Reform Act's administrative review scheme implicitly precludes this Court's federal question jurisdiction. To succeed on an implied preclusion argument, the Department must show both that Congress's intent to preclude district-court jurisdiction is "fairly discernible in the statutory scheme" and that Plaintiff's "claims are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994); *AFGE v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019) (explaining the two-step framework). At the second step, the Supreme Court has identified three factors that guide the inquiry: First, whether precluding district-court jurisdiction could "foreclose all meaningful judicial review"; second, whether the claim is "wholly collateral to a statute's review provisions"; and third, whether the claim is "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13 (cleaned up); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023).

Here, Plaintiff challenges government conduct that the government states is limited to the duration of the government shutdown and raises a pure question of constitutional law that is

unrelated to any duty, responsibility, or condition of employment. According to the Department, Congress intended to make relief for such a claim exclusively available through the Federal Labor Relations Authority, the Office of Special Counsel, or the Merit Systems Protection Board. But there are several reasons that Plaintiff's claim is not subject to such administrative channeling. Most importantly, Congress has chosen not to fund those administrative bodies during the present lapse in appropriations, leaving them unable to process any claims until the challenged Department conduct is over. Congress has also made it a criminal offense for those agencies' staff to do any work. In these circumstances, meaningful redress from the administrative process is impossible, and there is no basis to conclude that Congress intended to preclude this Court's jurisdiction.

> **A.    Congress did not intend to preclude district-court jurisdiction over Plaintiff's challenge to shutdown conduct because the CSRA's review mechanisms are entirely unavailable during the shutdown.**

"The Supreme Court has recognized that the CSRA, when functioning as Congress intended, was designed to strip district courts of jurisdiction." *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 304 (4th Cir. 2025) (citing *United States v. Fausto*, 484 U.S. 439, 441–42 (1988)). In ordinary circumstances, then, Congress's intent that claims within the scope of the CSRA cannot be brought in district court is "fairly discernible." *Thunder Basin*, 510 U.S. at 207. But "[t]o maintain Congress' intent, the MSPB and Special Counsel [and the FLRA] must function such that they fulfill their roles prescribed by the CSRA." *Nat'l Ass'n of Immigr. Judges*, 139 F.4th at 305. The government shutdown has frozen the CSRA's adjudicatory mechanism and made it unavailable to address the Department's conduct, which the Department says will last only the duration of the shutdown. When the CSRA's remedial scheme is not an option, Congress cannot have intended to preclude district-court jurisdiction.

The Department does not dispute that the OSC and the MSPB are closed for the duration of the shutdown and thus incapable of addressing the lawfulness of the Department's conduct during the shutdown. *See* Pl.'s Br. 20; Defs.' Br. 16–17.[1] The FLRA is also closed.[2] Not only are those agencies unfunded, but Congress has also criminalized their operation in the absence of appropriations. *See* 31 U.S.C. § 1350 (providing for imprisonment for violations of the Antideficiency Act). Congress could, of course, have provided for the CSRA's administrative review scheme's continued functioning during a government shutdown by funding it through a permanent appropriation or by exempting it from the Antideficiency Act. That it did not do so is evidence that it did not intend for the CSRA to preclude district-court jurisdiction to adjudicate the lawfulness of the Department's shutdown-related conduct.

The Department attempts to brush aside the total unavailability of the administrative review process as merely a concern with the immediacy or efficiency of administrative review. *See* Defs.' Br. 16–17. That argument misapprehends the nature of the problem. The challenged conduct by the Department will presumably last only the length of the shutdown; indeed, the Department agrees with this expectation in its briefing, stating that the messages will be "rescinded after the return of appropriations." *Id.* at 3. But the CSRA's administrative process is unavailable until the shutdown is over. There is thus no way that the FLRA, OSC, or MSPB could even begin to consider the lawfulness of the Department's conduct until after the conduct has ceased. And at that point, the Department plans to assert the conduct has "become

---

[1] Prior briefing is cited as follows, using the briefs' internal page numbers rather than page numbering in the ECF headers: Plaintiff's memorandum in support of motion for summary judgment, ECF No. 11-2 ("Pl.'s Br."); Defendants' memorandum in opposition to Plaintiff's motion for summary judgment and in support of Defendants' cross-motion for summary judgment, ECF No. 15-1 ("Defs.' Br.").

[2] *See FLRA Notice* (Oct. 1, 2025), https://perma.cc/U7CR-2M5M ("The Federal Labor Relations Authority (FLRA) is currently closed due to a lapse in appropriations").

constitutionally moot," potentially leaving Plaintiff with no opportunity to obtain a remedy at all. *Id.*[3] In any case, this Court should not decline to exercise its lawful jurisdiction based on a projection that future appropriations legislation will restore the availability of administrative channels. *See Garcia v. Texas*, 564 U.S. 940, 941 (2011) (a court's "task is to rule on what the law is, not what it might eventually be").

Even aside from the shutdown, recent events have undermined the Department's channeling argument. Congress intended for the MSPB and Special Counsel to be "strong and independent," and "free from '*any control or direction by the President.*'" *Nat'l Ass'n of Immigr. Judges*, 139 F.4th at 306 (quoting S. Rep. No. 95-969, at 6–7, 24). "The independence of the FLRA" was likewise "central to its creation." *Grundmann v. Trump*, 770 F. Supp. 3d 166, 170 (D.D.C. 2025). But the President in recent months has removed the Special Counsel, as well as members of the MSPB and the FLRA, without cause and in defiance of statutory protections against removal, arguing that the independence of those officers violates the separation of powers. *See Dellinger v. Bessent*, 768 F. Supp. 3d 33, 36 (D.D.C. 2025) (Special Counsel); *Harris v. Bessent*, 775 F. Supp. 3d 164, 169–70 (D.D.C. 2025) (MSPB); *Grundmann*, 770 F. Supp. 3d at 171 (FLRA). In so doing, this Administration has "call[ed] into question the constitutionality of a critical aspect of the CSRA, and the continued vitality of the statute's adjudicatory scheme." *Nat'l Ass'n of Immigr. Judges*, 139 F.4th at 307. As the Fourth Circuit has explained, there is strong reason to believe that Congress "intended the CSRA to strip district courts of jurisdiction only because it understood that the President could not exercise unfettered control over the Special Counsel and the MSPB." *Id.* The same reasoning applies to the FLRA.

---

[3] Plaintiff does not agree with the Department's premature assessment of future mootness. Nonetheless, it is not necessary to wait until that point to be able to obtain resolution of its claim.

The cases the Department relies on are not to the contrary. In *AFGE v. Trump*, the court of appeals held that unions could be required to proceed through the CSRA's administrative review scheme "at least so long as they can eventually obtain review and relief." 929 F.3d at 756. But that holding presumes the ordinary functioning of administrative review, which may be slower than district court litigation but will "eventually" provide judicial review. In the present circumstance, however, the CSRA process is not merely operating slowly or inefficiently; it is not operating at all.

The Department argues that there is "no basis, statutory or otherwise, to say that a court's subject matter jurisdiction can turn on the presence or absence of political gridlock." Defs.' Br. 17 (quoting *Jolley v. United States*, 549 F. Supp. 3d 1, 6 (D.D.C. 2021)). But the case that the Department cites concerned the lack of a quorum at the MSPB, which is a very different situation from a government shutdown. Even without a quorum, the MSPB at the time of that case had appropriated funds and continued to operate, subject to certain constraints.[4] The relevant inquiry here is not whether there is political gridlock, but rather whether Congress intended to require the use of the CSRA's administrative procedures at the same time that it made the operation of those procedures a federal crime.

**B.    Plaintiff's claim is not of the type that Congress intended to be reviewed under the CSRA.**

Even if Congress could have intended for the currently unavailable CSRA mechanism to continue to displace district-court jurisdiction for claims within the scope of the statute, this case does not present such a claim. Each of the three *Thunder Basin* factors "point in the same direction—toward allowing district court review" of Plaintiff's claim. *Axon*, 598 U.S. at 195.

---

[4] *See Frequently Asked Questions about the Lack of Quorum Period and Restoration of the Full Board* (Mar. 31, 2025), https://perma.cc/P6M7-ZB8M.

The first factor—whether precluding district-court jurisdiction could foreclose all meaningful judicial review—"is the most important factor in the *Thunder Basin* analysis." *Bennett v. SEC*, 844 F.3d 174, 183 n.7 (4th Cir. 2016) (collecting cases). As the Supreme Court has made clear, the mere eventual existence of judicial review is not enough to satisfy the first factor. For certain types of claims, judicial review can "come too late to be meaningful." *Axon*, 598 U.S. at 191. In *Axon*, the prospect of judicial review in the court of appeals following agency proceedings was not "meaningful" because the plaintiffs were challenging precisely their "subjection to an unconstitutionally structured decisionmaking process." *Id.* at 192. The Supreme Court likewise noted that "established immunity doctrines" present the same structural issue, whereby eventual judicial review cannot undo a violation of the right "not to stand trial or face other legal processes." *Id.* (cleaned up).

The First Amendment harm to Plaintiff's members here is of a piece, because it is both irreparable and structurally tied to the circumstances that make administrative review impossible. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). An irreparable injury, by definition, is one for which eventual judicial redress at the end of litigation (or an administrative review process) is insufficient. *See Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."). The First Amendment injury here, moreover, is uniquely tied to the very government shutdown that also renders administrative review impossible. Judicial review

following administrative exhaustion cannot possibly be meaningful for a First Amendment injury that will persist for precisely as long as administrative review is unavailable.

This Court's decision in *National Treasury Employees Union v. Trump*, 770 F. Supp. 3d. 1 (D.D.C. 2025), is not to the contrary. First, unlike Plaintiff here, plaintiffs in that case "d[id] not dispute that the claims it asserts are of the type generally covered by the FSLMRS scheme." *Id.* at 8. The plaintiff unions in that case also argued that judicial review after CSRA exhaustion would not be "meaningful" because they would allegedly suffer "irreparable" financial harm from the loss of union dues and bargaining power pending administrative exhaustion. *Id.* at 8–9. This Court noted that not "*any* irreparable injury suffices to defeat preclusion." *Id.* at 9. But the allegedly irreparable injuries there amounted to "routine burdens" that "fall outside the narrow class of structural constitutional claims" that *Axon* discussed. *Id.* Notably, the Court did not conclude that the unions' alleged injuries in that case actually were irreparable, and "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Wisc. Gas Co.*, 758 F.2d at 674. Here, Plaintiff's members are being forced to parrot partisan talking points only for so long as administrative review remains unavailable. That First Amendment injury is unquestionably irreparable and cannot be remedied by post-exhaustion judicial review.

None of the other cases the Department cites address the requirement for *meaningful* judicial review, as distinct from judicial review vel non. *AFGE v. Secretary of the Air Force* ("*Air Force*"), on which the Department principally relies, *see* Defs.' Br. 9–10, does not even cite *Thunder Basin*, or discuss the need for meaningful judicial review. 716 F.3d 633, 635 (D.C. Cir. 2013). Only one case the Department cites includes a First Amendment claim, *see AFGE v. Trump*, 929 F.3d at 753, and that case, decided before *Axon* clarified the requirement for

meaningful judicial review, did not consider the lack of redressability of even temporary First Amendment harms, or otherwise consider the possibility that delayed judicial review may not be meaningful.

Even if the CSRA's administrative review scheme were working as intended, the prospect of eventual judicial review is not meaningful for the kind of claim that Plaintiff presents here. That the administrative process is instead entirely inoperative merely underscores the need for this Court's review.

The second and third *Thunder Basin* factors likewise favor this Court's jurisdiction. Those factors "reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Axon*, 598 U.S. at 186. As Plaintiff's opening brief explained, this is not the kind of dispute over workplace conditions that is customarily handled under the CSRA. OSC and the MSPB have no special expertise or distinctive knowledge that could be relevant to resolving this case. *See* Pl.'s Br. 18–20. This case presents "standard questions of … constitutional law, detached from considerations of agency policy." *Axon*, 598 U.S. at 194 (cleaned up). And just as the FTC "knows a good deal about competition policy, but nothing special about the separation of powers," the FLRA, OSC, and MSPB know about federal labor and employment law, but nothing special about the First Amendment. *Id.*

The Department responds that Plaintiff's claim "is in the heartland of [CSRA] review because such a complaint is expressly reviewable under the grievance procedures for adjudicating a claim that the agency engaged in a prohibited personnel practice by coercing political activity." Defs.' Br. 12 (citing 5 U.S.C. § 2302(b)(3)). But as Plaintiff's opening brief explained, the CSRA deals with "working conditions," generally meaning "the daily concrete

parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources." Pl.'s Br. 19 (quoting *Turner v. Agency for Global Media*, 502 F. Supp. 3d 333, 366–67 (D.D.C. 2020)). The Department does not dispute that this case does not relate to "working conditions" in that sense.

Instead, the Department argues that the statutory prohibition on "coerc[ing] political activity" is sufficient to subject this dispute to administrative review . Defs.' Br. 11, 16 (citing 5 U.S.C. § 2302(b)(3)). That argument, however, ignores the text of the statute. The prohibition the Department relies on applies to "[a]ny employee who has authority to take … any personnel action," and provides that "*with respect to such authority*" they "shall not … coerce the political activity of any person (including the providing of any political contribution or service), or take any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity." 5 U.S.C. § 2302(b)(3) (emphasis added). And the statute separately defines a "personnel action" as any of eleven enumerated actions and "any other significant change in duties, responsibilities, or working conditions." *Id.* § 2302(a)(2). The CSRA thus may apply to anyone authorized to make changes to working conditions, and *with respect to that authority over working conditions*, prohibits them from coercing political activity. This case, like *Turner*, simply does not involve working conditions.

The Department resists on two fronts. First, it argues that Plaintiff's claim is necessarily "personnel-related" merely because "AFGE's members and the Department are in an employment relationship." Defs.' Br. 14. In the Department's view, the mere fact of the employment relationship means that any and every claim that Plaintiff's members may ever have against the Department necessarily falls under the CSRA, regardless of the statutory text. That "theory ill fits the point of the *Thunder Basin* inquiry—to decide when a particular claim is 'of

the type' to fall outside [the] statutory review scheme." *Axon*, 598 U.S. at 194 (quoting *Thunder Basin*, 510 U.S. at 212).

Second, the Department argues that the Supreme Court "decisively held" in *Elgin v. Department of the Treasury*, 567 U.S. 1, 12–13 (2012), "that the CSRA precludes facial constitutional challenges for covered employees." Defs.' Br. 15. But as Judge Howell noted in *Turner*, *Elgin*'s holding is not nearly so broad. 502 F. Supp. 3d at 366. *Elgin* held that even constitutional claims were not "wholly collateral" to the CSRA's remedial scheme when they were "the vehicle by which [petitioners] seek to reverse the [challenged] removal decisions, to return to federal employment, and to receive compensation they would have earned but for the adverse employment action." 567 U.S. at 22. In other words, labelling a claim as "constitutional" is not enough to avoid the CSRA when the claim otherwise involves core CSRA considerations of working conditions. That says nothing about claims such as this one that are entirely independent of any claim about working conditions under the CSRA. *See Turner*, 502 F. Supp. 3d at 366–67; *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996).

Plaintiff's members are suffering immediate, here-and-now First Amendment harms that have nothing to do with their working conditions or any personnel action by the Department of Education. Requiring them to exhaust the CSRA's remedial scheme would not provide "meaningful" judicial review even if that scheme were functioning as intended. And even if they were operational, the FLRA, OSC, and MSPB have no particular expertise to apply here. In short, every relevant consideration under *Thunder Basin* supports this Court's jurisdiction over this case.

## II.    <u>This case is not prudentially moot.</u>

The Department concedes that this case is not constitutionally moot and that this Court has jurisdiction to decide the case before it, yet it urges the Court to exercise its discretion to

dismiss this case as "prudentially moot." Defs.' Br. 17. But the Department's modification of the challenged partisan out-of-office messages does not eliminate the constitutionally problematic language or moot the constitutional claim.

Plaintiff brought this suit to challenge the Department's co-opting of employee speech to amplify the Trump Administration's political talking points. The Department is continuing that practice, so the lawfulness of that practice remains a live issue. "Prudential mootness concerns often arise when a defendant has ceased its allegedly illegal conduct and is reconsidering or has reconsidered the policy that created the harm in the first place." *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 264 (D.D.C. 2014) (collecting cases). The Department has not "ceased its allegedly illegal conduct." *Id.* To the contrary, it has doubled down on that conduct by maintaining the offending partisan language in the out-of-office messages and stating its intent to continue that practice. Forrester Decl. ¶ 7.

The Department's revision of the out-of-office language is not a discontinuation and repudiation of the unlawful practice that might justify this Court staying its hand. "In determining whether it should dismiss a case which is not technically moot, but in which the defendant voluntarily has discontinued the challenged activity, the court should consider whether there remains 'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive,'" taking "into account 'the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.'" *Cmty. for Creative Non-violence v. Hess*, 745 F.2d 697, 700–01 (D.C. Cir. 1984) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). In addition, "sound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its

ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 331 (1961).

The Department has not "voluntarily … discontinued the challenged activity" because it continues to send partisan political messages from individual employee email accounts without giving employees any choice about whether to speak in that manner. *Hess*, 745 F.2d at 700. The Department's post-complaint revision to the messages shows nothing other than its insistence on continuing to use individual employees' email accounts as mouthpieces for partisan political language. And there is no indication that the language is at this time "undergoing significant modification," which could raise the concern of a judicial remedy aimed at a moving target. *A.L. Mechling*, 368 U.S. at 331. On the contrary, the Department states that this is its settled position. In asserting a full-throated defense of its inclusion of partisan language in individual employees' out-of-office messages, the Department has confirmed that it intends to maintain its current practice and does not intend to make any further changes that might redress the injuries to Plaintiff's members. *See* Forrester Decl. ¶ 7. Simply put, the Department's minor voluntary modification, which does not change the nature of the challenged conduct, does not render the case prudentially moot.

Nor should the Court stay its hand because of the possibility that the shutdown could end while this litigation is pending. *Contra* Defs.' Br. 19. In a case like this one, "where harm is ongoing and relief would be effective, the Court is not obligated to step aside, nor have courts made a habit of doing so—even where a case might become moot shortly." *Conservation L. Found.*, 37 F. Supp. 3d at 265. And the Department's premature assessment of mootness is not well taken. *See supra* n.3. The Court should decide the merits of this case.

Finally, the Department is wrong that the Court should not consider the modified language of the out-of-office messages, which the Department implemented after Plaintiff filed the complaint. Defs.' Br. 19–20. The fact that the Department modified the out-of-office messages is undisputed and, in fact, is included in each side's statement of undisputed material facts. Pl.'s Statement of Undisputed Material Facts ¶ 9; Defs.' Statement of Undisputed Material Facts ¶ 6. And the Department's post-complaint machinations have not changed the nature of the challenged conduct nor the nature of Plaintiff's claim. Plaintiff's First Amendment claim is that "[t]he partisan language added to Department of Education employees' out-of-office email responses is not speech that is within the employees' official duties." Compl. ¶ 45. The Department still has "no legitimate interest in forcing Department employees to recite partisan words that they would not have spoken otherwise." *Id.* ¶ 47. And "Defendants' co-opting of their employees' email correspondence to speak against their will on this matter of public concern" still "violates employees' First Amendment rights to free speech and free association." *Id.* ¶ 48. There remains a need for the requested remedies, which are a declaration that the Department "violated the First Amendment rights of furloughed agency employees by changing employees' out-of-office email messages to include partisan political language without the employees' knowledge or consent" and an injunction against "modifying agency employees' email out-of-office messages to include partisan political speech or otherwise requiring agency employees to include partisan political speech in email correspondence." ECF No. 11-4 at 1; *see* Compl., Prayer for Relief ¶¶ A, B. This relief squarely encompasses both the original and revised wording of the automatic out-of-office messages, both of which are part of the same unconstitutional conduct. A decision to the contrary risks incentivizing defendants to seek to evade judicial review by making minor changes to challenged conduct and claiming mootness.

### III. Compelling Department employees to speak a partisan political message violates the First Amendment.

The Department is compelling individual employee speech on a matter wholly outside employees' official duties. That is not, as the Department argues, government speech beyond the reach of the First Amendment. The Department relies on the wrong test in support of its government-speech argument, but under either test, the partisan political messages are unlawfully compelled personal speech by individuals and not government speech.

**1.** Two well-established principles are at play here. First, the First Amendment protects against compelled speech and compelled association. *E.g.*, *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 797 (1988) (the First Amendment protects "the decision of both what to say and what *not* to say"); *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) ("The government may not … compel the endorsement of ideas that it approves."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association … plainly presupposes a freedom not to associate.").

Second, the First Amendment does not prevent the government from speaking for itself and expressing a viewpoint of its own. *E.g.*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech … is exempt from First Amendment scrutiny."); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) (stating that the government may "select the views that it wants to express").

The Department invokes the latter principle and argues that the partisan out-of-office messages are government speech that does not implicate the First Amendment. But such a claim requires careful examination. Because characterizing speech as government speech "strips it of all First Amendment protection," *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 221 (2015) (Alito, J., dissenting), the Supreme Court has cautioned that "it is a

doctrine that is susceptible to dangerous misuse," *Matal v. Tam*, 582 U.S. 218, 235 (2017). This Court should not countenance the Department's misuse of the government-speech doctrine to circumvent its employees' First Amendment protection against compelled speech.

**2.** The parties disagree on the legal test that the Court should apply to determine whether this case presents government speech. Plaintiff's summary judgment motion invoked a line of cases about public employee speech, under which the key question that determines the applicability of the First Amendment is whether the speech is within the employee's official duties. Pl.'s Br. 12–15. The Department instead relies on a three-factor test from outside the public employee context that it calls the "*Walker-Summum* test." Defs.' Br. 22–24. The test that Plaintiff identified is the appropriate one because public employee speech is at issue.

Cases about public employee speech have long recognized that public employees retain First Amendment rights, including the right to be protected from compelled speech. *E.g.*, *Janus v. AFSCME*, 585 U.S. 878, 902–05 (2018); *Connick v. Myers*, 461 U.S. 138, 140 (1983). But under those cases, "employee speech is largely unprotected if it is part of what the employee is paid to do." *Janus*, 585 U.S. at 905. "[W]hen public employees make statements pursuant to their official duties," they do not receive First Amendment protection. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). That is because "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer." *Janus*, 585 U.S. at 910. Put another way, when a public employee speaks as part of their job duties, those words are really the words of the government—i.e., government speech that does not implicate the First Amendment. In contrast, First Amendment rights do apply to a public employee's speech outside their job duties on matters of public concern. *Garcetti*, 547 U.S. at 423.

16

The Supreme Court recently recognized that the test for whether a public employee's speech is government or personal speech is whether the speech is within the employee's job duties. "If a public employee speaks 'pursuant to [his or her] official duties,' th[e Supreme] Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022).

The Department thus misunderstands the case law when it accuses Plaintiff of "all but ignor[ing] the government speech doctrine." Defs.' Br. 24. The public employee cases addressed in Plaintiff's motion *are* cases about the government-speech doctrine, in the context of determining the governmental or personal nature of public employee speech.

The Department argues that the proper test is a multi-factor inquiry from a different line of cases. In the Department's view, Defs.' Br. 21, the Court should determine whether to apply the government-speech doctrine by considering "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) (citing *Walker*, 576 U.S. at 209–14; *Summum*, 555 U.S. at 470–72).

The Department's test is inapplicable here, however, because it comes from a line of government-speech cases that did not involve public employee speech. *See Walker*, 576 U.S. at 203 (specialty vehicle license plates); *Summum*, 555 U.S. at 464 (monuments in a city park);

*Pulphus*, 249 F. Supp. 3d at 240 (artwork competition for display in U.S. capitol complex).[5] That test applies "[w]hen courts are unsure whether a government entity is speaking for itself or hosting a forum for private speech." *Penkoski*, 548 F. Supp. 3d at 22. For instance, the test helps determine whether a city park became a forum when the city displayed donated monuments there, whether license plates became a forum when Texas allowed submission of specialty designs, or whether the U.S. Capitol building became a forum when the government hosted a public art competition. *Walker*, 576 U.S. at 214–17; *Summum*, 555 U.S. at 467; *Pulphus*, 249 F. Supp. 3d at 247. In contrast, this case does not present the question of whether the Department opened a public forum for private speakers to express themselves. Rather, the question is whether speech by a government employee amounts to speech by the government itself. Plaintiff has identified the correct test.

**3.** Under the public employee line of cases, the partisan political out-of-office messages are not government speech. It is not within the job duties of Department of Education employees to opine on the contentious political question of which party is to blame for the government shutdown. No material facts are in dispute, so the Court can reach this conclusion on summary judgment.[6]

---

[5] The other cases that the Department cites in support of this test also did not involve public employee speech. *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 16–17 (D.D.C. 2021) ("Black Lives Matter" mural painted by the D.C. government on a city street); *Small Bus. in Transp. Coal. v. Bowser*, 610 F. Supp. 3d 149, 152 (D.D.C. 2022) (same); *Jud. Watch, Inc. v. Bowser*, 590 F. Supp. 3d 1, 3 (D.D.C. 2022) (same).

[6] The Department did not respond to Plaintiff's statement of material facts, ECF No. 11-3, with a statement of "all material facts as to which it is contended there exists a genuine issue necessary to be litigated," LCvR 7(h). The Department filed only a statement of undisputed material facts in support of its own cross-motion for summary judgment. ECF No. 15-2. The Court thus "may assume that [the] facts identified" in Plaintiff's statement of material facts "are admitted." LCvR 7(h). Meanwhile, Plaintiff does not dispute any of the Department's statement of material facts, ECF No. 15-2.

The proper inquiry is whether transmitting partisan, political out-of-office messages is part of employees' job responsibilities. The "critical question … is whether *the speech at issue is itself* ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014) (emphasis added). Sending messages blaming "Democrat Senators" for the failed congressional negotiations that led to the government shutdown is not "part of what the employee is paid to do." *Janus*, 585 U.S. at 905. Nor is it "part of an employee's official duties." *Id.* at 908; *Garcetti*, 547 U.S. at 421.

The Department does not dispute that making such partisan political statements is not part of the job responsibilities of rank-and-file civil servants. *E.g.*, D. Doe Decl. ¶ 3; E. Doe Decl. ¶ 4; F. Doe Decl. ¶ 3; G. Doe Decl. ¶ 4; I. Doe Decl. ¶ 3. Instead, the Department abstracts the issue to a higher level of generality: Rather than arguing that partisan, political out-of-office messages are part of employees' job duties, the Department argues that the general act of setting out-of-office messages is part of employees' job duties. To be sure, setting out-of-office messages generally serves the official function of "inform[ing] email correspondents about the lapse in appropriations and the employee's work status." Defs.' Br. 21. Put that way, the out-of-office messages sound innocuous. But that lawyerly reframing deflects the real issue. The part of the emails that blames "Democrat Senators" for the shutdown has nothing to do with informing email correspondents about the shutdown and the employee's availability. An ordinary out-of-office message without a partisan attack, like the model language that the Department initially suggested for its employees, amply serves that purpose. ECF No. 9-10 at 7; ECF No. 15-3 at 10. There is no factual dispute that transmitting a political opinion about cause of the shutdown—the speech at issue here—is outside the scope of a Department employee's job duties.

The implications of the Department's alternative framing are startling. Communicating by email with educators is, in a general sense, part of some of its employees' job duties. Under the Department's logic, the Department could require its employees to send political fundraising requests, get-out-the-vote messages, or ad hominem attacks on persons, organizations, or jurisdictions perceived to oppose the Administration's policy goals—or co-opt individual email addresses to automatically send such emails—and the First Amendment would offer no protection. Under that logic, the Department could also require each employee to include such language in the signature block of every email that they send. The scope of a government employee's job-related speech cannot be understood at that level of generality.

The Hatch Act bolsters the conclusion that partisan political messages cannot be speech within the official, professional capacities of federal employees. The Hatch Act prohibits employees from engaging in any "activity directed toward the success or failure of a political party," 5 C.F.R. § 734.101, while "on duty," 5 U.S.C. § 7324(a)(1). This statutory limitation reinforces the conclusion that the Department is forcing employees to speak outside of their official duties.[7] Speech by a government employee outside the scope of the employee's government duties is not government speech. *Kennedy*, 597 U.S. at 527.

Because the Department is compelling employees' personal speech on a matter of public concern—rather than speaking for itself—the First Amendment is at issue. The case law is uncertain about whether government compulsion of such speech from its employees is per se

---

[7] Defendants do not dispute that the partisan out-of-office messages raise, at a minimum, significant concerns about Hatch Act compliance. Instead, they merely argue that the Hatch Act is enforced by the Office of the Special Counsel and that Plaintiff may not pursue a "Hatch Act complaint dressed up as a First Amendment challenge." Defs.' Br. 27. But Plaintiff is not asserting any private cause of action to enforce the Hatch Act and is not seeking relief for any Hatch Act violation. The Hatch Act is simply relevant to determining the scope of employees' official duties for purposes of Plaintiff's First Amendment claim.

unlawful or whether it might be justified based on a balancing of government and employee interests. *Janus*, 585 U.S. at 905. But the Court need not resolve that issue because, even if a balancing test were to apply, no legitimate government interest justifies the heavy burden of compelled speech on employees' First Amendment interests, and the Department does not argue that the balance of interests should come out any differently. Pl.'s Br. 15–16; Defs.' Br. 27–28.

**4.** Although the *Walker-Summum* three-factor test is inapplicable as explained above, that test would lead to the same result. As to the first factor, individual employees' out-of-office messages are not a medium that has "historically been used" to communicate an agency's political messages to the public, let alone "speak to the public" about a federal agency's official position on any substantive issue. *Pulphus*, 249 F. Supp. 3d at 247–48. As to the second factor, the "public would reasonably interpret" the individual employee to be the speaker where a political message comes from an individual email account, with the individual identified by name as the sender. *Id.* at 249–50. That is particularly so for the first version of the partisan message that the Department pushed onto its employees, which used first-person language ascribed to each individual employee.[8] But even the revised version of the partisan message is sent from each individual email address, with each individual employee identified by name as the sender. As to the third factor, the Department relies on its technical ability to make system-wide changes to out-of-office messages, but it produced no evidence that it has generally

---

[8] The Department argues that Plaintiff has not "provide[d] evidence—beyond hearsay speculation" about how the public would reasonably interpret the message. Defs.' Br. 23. Setting aside that Defendants misconstrue the cited declarations, which contain no hearsay evidence, Defendants do not support their own cross-motion with any evidence that the public would reasonably see the automated emails as conveying the government's messages. In any case, neither side need present such evidence because how a reasonable member of the public would interpret these circumstances is a question of law, not an evidentiary question. *Cf. Connick*, 461 U.S. at 148 n.7.

controlled the substance of employees' out-of-office messages, much less with this degree of specificity. On the contrary, the Department's instructions to furloughed employees included "recommend[ed]" out-of-office language that did not include partisan language. ECF No. 9-10 at 7; ECF No. 15-3 at 10. There is no known history of the Department setting employees' out-of-office messages en masse. *See* C. Doe Decl. ¶¶ 2, 11 (ten-year Department employee stating that they had never been asked to use partisan language in a communication attributed to them); D. Doe Decl. ¶¶ 2, 5 (five-year Department employee stating that "Department staff typically set their own out-of-office messages"). The co-opting of individual employees' out-of-office emails to transmit the agency's messaging is an unprecedented compulsion of employee speech, not the use of an established channel for government speech.

* * *

Government employees have the right not to be forced to make partisan political statements that are outside their job duties. The Department badly overreaches when it claims that, if Plaintiff were correct, "government would not work." Defs.' Br. 26 (quoting *Walker*, 576 U.S. at 207). The Department has identified no precedent for a mass political messaging campaign of this sort that compels speech by individual agency employees. Concluding that the Department has violated the First Amendment does not preclude the government from speaking the same messages using ordinary governmental channels for political communication. The First Amendment does not prevent the President, for example, from speaking about which political party he believes is to blame for the shutdown. There is nothing unworkable about holding the Department's unprecedented actions to be unlawful.

**IV.    The Court should enter declaratory and injunctive relief.**

The Department does not dispute that a declaratory judgment and permanent injunctive relief are appropriate in this case. *See* Pl.'s Br. 21–23; Defs.' Br. 28. The Department merely argues that injunctive relief should be limited to Plaintiff's members.

The Supreme Court held in *Trump v. CASA, Inc.*, that courts have the equitable authority to administer complete relief between the parties. 606 U.S. 831, 851 (2025). The Department has explained that its Office of the Chief Information Officer has the technological ability to change employees' out-of-office messages "on a system-wide basis." Forrester Decl. ¶ 5. The Department has not explained how, if ordered to do so by the Court, it would remove the partisan political language from only Plaintiff's members' out-of-office messages without removing the partisan language system-wide. The Court should ensure that it issues an injunction that affords complete relief to Plaintiff's members.

## CONCLUSION

The Court should grant Plaintiff's motion for summary judgment, ECF No. 9, and deny Defendants' cross-motion for summary judgment, ECF No. 15.

Respectfully submitted,

*/s/ Tsuki Hoshijima*

<table>
<tr><td>

Cormac Early (D.C. Bar No. 1033835)
Allison Zieve (D.C. Bar No. 424786)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-1000

</td><td>

Tsuki Hoshijima (MA Bar No. 693765)
Christine L. Coogle (D.C. Bar No. 1738913)
Jyoti Jasrasaria (D.C. Bar No. 1671527)
Robin F. Thurston (D.C. Bar No. 7268942)
Skye L. Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090

*Counsel for Plaintiff*

</td></tr>
</table>