**Exhibit A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,

     *Plaintiff*,

     v.

U.S. DEPARTMENT OF EDUCATION and
LINDA MCMAHON, in her official capacity as
Secretary of Education,

     *Defendants*.

Case No. 25-cv-3553-CRC

**[PROPOSED] BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................................1

SUMMARY OF ARGUMENT...........................................................................................1

ARGUMENT .....................................................................................................................2

    I.     Congress and the Executive Have Established a "Nonpartisanship Principle" for Federal Employees Engaged in Official Duties .............................................................2

         A.  Prior to the Rise of the Nonpartisan Principle, a Spoils System Pervaded in the Federal Government.......................................................................................4

         B.  The Pendelton Act ............................................................................................5

         C.  The Hatch Act .................................................................................................7

             i.      Another Period of Corrosive Partisanship Gave Rise to the Hatch Act.......7

             ii.     The Original Hatch Act ........................................................................8

             iii.    Subsequent Amendments ........................................................................10

    II.    The Trump Administration Has Abrogated the Nonpartisanship Principle .................12

    III.   Federal Employees' "Official Duties" Do Not Encompass Partisan Speech..............15

CONCLUSION....................................................................................................................18

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................5

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ..........................................................16, 17

*Komatsu v. City of New York*, No. 20-cv-07046, 2021 WL 3038498 (S.D.N.Y July 16, 2021) ....11

*Lane v. Franks*, 573 U.S. 228 (2014) ..................................................................17

*United States Civil Service Commission v. National Association of Letter Carriers*,
    413 U.S. 548 (1973) ...................................................................................4

**Statutes and Codes**

5 U.S.C. § 1215 .............................................................................................11

5 U.S.C. § 1215(b) ........................................................................................13

5 U.S.C. § 1216 .............................................................................................11

5 U.S.C. § 1504–1508 ...................................................................................11

5 U.S.C. § 7321–7326 ...............................................................................3, 11

54 Stat. 767 (1940) ........................................................................................9

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) .........................................3

Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883) ....................................3, 5

**Other Authorities**

2 Opinion Office of Legal Counsel 107 (1978) .................................................13

84 Cong. Rec. 3045 ........................................................................................9

84 Cong. Rec. 3176 ........................................................................................9

84 Cong. Rec. 3855 ........................................................................................9

84 Cong. Rec. H9604 (daily ed. July 20, 1939) ................................................8

Adriana Gomez Licon & Rio Yamat, *Some airports refuse to play Noem video on shutdown
    impact, saying it's political*, Associated Press (Oct. 14, 2025), https://apnews.com ..............15

Campaign Legal Center, *Enforcing the Hatch Act*, https://campaignlegal.org/cases-
    actions/enforcing-hatch-act ......................................................................1

Campbell Robertson and Eileen Sullivan, *Some States with Democratic Governors are Posting Partisan Shutdown Messages on Official Websites*, N.Y. Times (Oct. 20, 2025), https://www.nytimes.com .......................................................................15

CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (Nov. 29, 2017), https://perma.cc/3B4P-HJPT ...........................................13

CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (Dec. 7, 2017), https://perma.cc/KVR5-S7GB ...........................................13

CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (May 8, 2019), https://campaignlegal.org .......................................................13

Cong. Rec. S. 10012 (May 10, 1990) ......................................................................11

Cynthia Brown & Jack Maskell, *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age*, Congressional Research Service (2016) ......................................2

David Porter, *Senator Carl Hatch and the Hatch Act of 1939*, 48 N.M. Hist. Rev. 151 (1973)......8

Delaney Marsco, *Hatch Act Reform Cannot Wait*, Campaign Legal Center (Nov. 21, 2018), https://campaignlegal.org/update/hatch-act-reform-cannot-wait ...............................1

Delaney Marsco, *Spurred by CLC Complaints, Conway Recommended for Dismissal After Repeated Ethics Violations*, Campaign Legal Center (June 13, 2019), https://campaignlegal.org/update/spurred-clc-complaints-conway-recommended-dismissal-after-repeated-ethics-violations...............................................................................1

Gillian E. Metzger, *The Interdependent Relationship Between Internal and External Separation of Powers*, 59 Emory LJ. 423 (2009) ......................................................................3

*Hatch Act Reform Amendments of 1993: Hearings Before the U.S. Senate Committee on Governmental Affairs on S. 185*, 103rd Cong. (1993) ....................................4, 8, 10

Hatch Act Reform Amendments of 1993, H.R. 20, 103rd Cong. § 2 (1993)................................11

Jason Scott Smith, *Building New Deal Liberalism: The Political Economy of Public Works, 1933-1956* (2006)........................................................................................7

Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563 (2024) ...........................2, 4, 6, 7, 10

Letter from Jimmy Carter to U.S Congress (Mar. 2, 1978), *reprinted by* The American Presidency Project, https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress (last visited Oct. 21, 2025)..................................................5

Letter from Senators Richard Blumenthal, et al. to Kristi Noem (Oct. 15, 2025), https://www.blumenthal.senate.gov ......................................................................14

Lisa Desjardins & Layla Quaran, *The history of civil service and the impact of Trump's slashing of the workforce*, PBS News (Mar. 14, 2025), https://www.pbs.org/newshour/show/the-history-of-civil-service-and-the-impact-of-trumps-slashing-of-the-workforce ........................3

Martha McHardy, *Giant Donald Trump Portrait Draped Over Department of Labor Building in DC*, Newsweek (Aug. 26, 2025), https://www.newsweek.com ...............................................14

*Message from the President of the United States: Veto of Hatch Act Repeal*, H.R. Doc. No. 94-449 (1976) .......................................................................................................................10

Neal Kumar Katyal, *Internal Separation of Powers: Checking Today's Most Dangerous Branch from Within*, 115 Yale L.J. 2314 (2006) ..................................................................................3

Office of Senator Adam Schiff, Propaganda: How the Trump Administration is Breaking the Law and Wasting Taxpayer Dollars with Giant Banners of Donald Trump (Sep. 2025), https://www.schiff.senate.gov ......................................................................................14

Priscilla Ferguson Clement, *The Works Progress Administration in Pennsylvania, 1935 to 1940*, 95 Penn. Mag. History & Biography (1971) ................................................................7

Remarks on Signing the Hatch Act Reform Amendments of 1993, 29 Weekly Comp. Pres. Doc. 2012 (Oct. 6, 1993) ......................................................................................................11

*Seven More Complaints Filed for Trump Administration Hatch Act Violation*, Public Citizen (Oct. 2, 2025), https://www.citizen.org .....................................................................15

Shannon Pettypiece, *White House transforms from people's house to campaign venue*, NBC News (Aug. 23, 2020), https://www.nbcnews.com ................................................14

*The History of the Hatch Act*, The Postal Record (Aug. 2021), https://www.nalc.org/news/the-postal-record/2021/august-2021/document/History-of-the-Hatch-Act.pdf ...........................7

U.S. Civil Service Commission, First Annual Report (1883)....................................................5, 6

U.S. Office of Special Counsel, Clarification of November 27, 2018 Email (Nov. 30, 2018), https://osc.gov ...........................................................................................................15

U.S. Office of Special Counsel, *How to File a Hatch Act Complaint*, https://osc.gov/Services/Pages/HatchAct-FileComplaint.aspx (last visited Oct. 20, 2025) ....12

U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump Administration Officials During the 2020 Presidential Election (Nov. 9, 2021), https://osc.gov ...........................................................................................................12

U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Dec. 7, 2020), https://osc.gov .................................................................12

U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Feb. 12, 2021), https://osc.gov (OSC File No. HA-20-000091 (Amb. Carla Sands)) ........................................................................................................12, 13

U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (June 13, 2019), https://osc.gov .................................................................12

U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Mar. 6, 2018), https://osc.gov .................................................................12

U.S. Office of Special Counsel, Report on Prohibited Political Activity (OSC File Nos. HA-19-0631 & HA-19-3395) (May 30, 2019), https://osc.gov ...........................................................12

## INTEREST OF AMICUS CURIAE

Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization dedicated to solving the wide range of challenges facing American democracy. CLC has a robust focus on government ethics and works to enforce and reform ethical guidelines and laws at all levels of government to ensure public trust and accountability. CLC regularly engages with the public and civic leaders to ensure that potential conflicts of interest and their appearance are avoided, clear ethical guidelines are established and followed, and that public confidence in government is well earned.

CLC submits this brief based on its Hatch Act expertise.[1] CLC is concerned about the harm that could result from a holding that establishes that political speech is part of a federal employee's official duties in a manner that contravenes long-established prohibitions on federal employees engaging in partisan politics while operating in their official capacity.

## SUMMARY OF ARGUMENT

Partisan speech cannot be a part of a federal employee's official duties. A longstanding history of statutes and norms prohibits partisan speech by federal employees who are working in their official capacity. For more than a century, Congress, the Executive, and the country have agreed that federal employees' partisan political activity must be limited to ensure that the government operates in a manner that is fair, efficient, and free of corrosive influences. Congress

---

[1] *See* Campaign Legal Center, *Enforcing the Hatch Act*, https://campaignlegal.org/cases-actions/enforcing-hatch-act (last visited Oct. 21, 2025); Delaney Marsco, *Hatch Act Reform Cannot Wait*, Campaign Legal Center (Nov. 21, 2018), https://campaignlegal.org/update/hatch-act-reform-cannot-wait; Delaney Marsco, *Spurred by CLC Complaints, Conway Recommended for Dismissal After Repeated Ethics Violations*, Campaign Legal Center (June 13, 2019), https://campaignlegal.org/update/spurred-clc-complaints-conway-recommended-dismissal-after-repeated-ethics-violations.

has enshrined this nonpartisanship principle in statute by mandating nonpartisanship in the civil service. This principle has become an important part of the separation of powers, serving as an internal check on the Executive. The notion that partisan speech could be a part of a federal employee's official duties flies in the face of this principle.

Across President Donald Trump's terms in office, adherence to this principle has diminished. Partisan influence rings throughout the federal government. Whether or not such partisan influence violates the law is not the issue before this Court. Rather, one of the relevant questions before the Court is whether partisan speech could lawfully be a part of a federal government employee's official duties. The nonpartisanship that has long been a consistent guiding principle of the federal government indicates that such partisan speech cannot be a part of those duties.

## ARGUMENT

### I.    Congress and the Executive Have Established a "Nonpartisanship Principle" for Federal Employees Engaged in Official Duties.

Over the course of a century and a half, Congress—working with the Executive—has established laws that promote nonpartisanship in the federal government. These statutes protect "federal employees from coercion by higher level, politically appointed supervisors" to require "political activities against their will." Cynthia Brown & Jack Maskell, *Hatch Act Restrictions on Federal Employees' Political Activities in the Digital Age*, Cong. Rsch. Serv., at 1 (2016). Such laws "assure a nonpartisan and evenhanded administration of federal laws and programs." *Id.* This long history of nonpartisanship in the federal government has created a "nonpartisanship principle," which "has become a fundamental feature of our system—an aspect, and indeed a core component, of the separation of powers and even the rule of law." Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563, 1625 (2024).

The longstanding protections for nonpartisanship in the federal government include the Pendleton Act and the Hatch Act. The Pendleton Act established that federal workers should be hired based on their merit and qualifications, rather than political affiliation or cronyism. Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883). The Hatch Act restricts federal employees' political activities to ensure that federal employees remain nonpartisan while executing their official duties. Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5 U.S.C. §§ 1501–08, 7321–26). These statutes formed and continue to regulate the civil service to ensure that its daily, bureaucratic functions are protected from partisanship. *See* Lisa Desjardins & Layla Quaran, *The history of civil service and the impact of Trump's slashing of the workforce*, PBS News (Mar. 14, 2025), https://www.pbs.org/newshour/show/the-history-of-civil-service-and-the-impact-of-trumps-slashing-of-the-workforce. A nonpartisan civil service insulates the Executive branch from politics and allows the government to function in a manner that benefits all Americans, regardless of their political affiliation. Protecting the daily tasks of the government from politics in this way promotes the separation of powers. Gillian E. Metzger, *The Interdependent Relationship Between Internal and External Separation of Powers*, 59 Emory L.J. 423, 429 (2009) (citing "the civil service and its prohibitions on politically-motivated employment decisions" as a mechanism that serves an "internal Executive Branch checking function"); Neal Kumar Katyal, *Internal Separation of Powers: Checking Today's Most Dangerous Branch from Within*, 115 Yale L.J. 2314, 2317 (2006) ("A critical mechanism to promote internal separation of powers is bureaucracy.").

**A. Prior to the Rise of the Nonpartisanship Principle, a Spoils System Pervaded in the Federal Government.**

Concerns that partisanship could taint the quotidian operations of the federal government date back to the founders. Thomas Jefferson, "one of the very first people to comment on the issue of employee political activity, observed that it violated the spirit of the Constitution for Federal officials to engage in electioneering." *Hatch Act Reform Amendments of 1993: Hearings Before the S. Comm. on Governmental Affairs on S. 185*, 103rd Cong., at 11 (1993) (statement of Sen. William Roth). In response, the heads of executive branch departments issued an order that an officer of the executive branch could vote in elections, but his vote must not "have any effect to his prejudice." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973) (quoting 10 J. Richardson, Messages And Papers Of The Presidents 98–99 (1899)). The officer must "not attempt to influence the votes of others nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it." *Id.*

Despite these concerns and early attempts to corral partisanship in the federal government, a spoils system pervaded in early presidential administrations. Under this spoils system "[p]olitical leaders installed cronies—sometimes manifestly unqualified ones—in a range of positions, with the ever-present prospect of turnover undermining expertise, morale, and the quality of government service." Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563, 1573 (2024) (citing Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 Am. Hist. Rev. 301, 301–02 (1959)). The spoils system collapsed the "important distinction between elective officers and the constitutional advisers of the President, on the one hand, who represent and must deal with political opinions" with federal government employees who are "the purely administrative subordinates . . . representing neither opinions nor interests" and who must "do their work in the same manner

irrespective of political or religious opinions, whatever party may be in power." U.S. Civ. Serv. Comm'n, First Annual Report 11–12 (1883). The spoils system led to "[a] virtual repudiation of the moral and legal duty of the appointing power, to select the most meritorious applicant, and consequently an unjust and despotic denial of the paramount claims of the most worthy"; serious impairment of "the independence essential to the constitutional responsibility of executive officers for the proper execution of the laws"; and members of Congress, who were pursued by "threats of those demanding it as a reward for partisan work" and forced to "foist incompetent supernumeraries upon the public treasury which it was their special duty to protect[.]" *Id.*

Due to the shortcomings inherent to a spoils system, efforts to limit partisanship and "to divorce governmental power from individual self-interest" in the federal government date back to at least the Revolutionary Era. *Id.* (citing Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 9, 83 (2013)). These efforts persisted due to "strong discontent with the corruption and inefficiency of the patronage system of public employment[.]" *Elrod v. Burns*, 427 U.S. 347, 354 (1976).

### B. The Pendelton Act

In 1883, efforts to eliminate the spoils system culminated in Congress's passage of the Pendleton Act, which provided that "no person in the public service is . . . under any obligations to contribute to any political fund, or to render any political service"; guaranteed that federal workers "will not be removed or otherwise prejudiced for refusing to do so"; and prohibited federal employers from "coerc[ing] the political activity of any person or body." Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883). The Act formally established the United States Civil Service Commission and the merit system it administered. *See id.*; *see also* Letter from Jimmy Carter to U.S Cong. (Mar. 2, 1978), *reprinted by* The Am. Presidency Project, https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress

(last visited Oct. 21, 2025). Congress overwhelmingly supported the Pendleton Act, and the Act passed with a vote of 155-47 in the House and 38-12 in the Senate. Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563, 1576 (2024) (citing Ari Hoogenboom, Outlawing the Spoils: A History of the Civil Service Reform Movement 1865-1883, at 246, 249 (1968)). Congress's "patriotic surrender of so much of their patronage" from the spoils system was "emphatic evidence that the old system had become intolerable[.]" U.S. Civ. Serv. Comm'n, First Annual Report 11 (1883).

The Civil Service Commission's first report promulgated a variety of rules to guide civil servants. The first rule—known as Civil Service Rule I—was that "[o]fficial authority and influence must no longer be used to impair the freedom of elections or to coerce the political action of citizens." U.S. Civ. Serv. Comm'n, First Annual Report 7 (1883); *see also U.S. Civ. Serv. Comm'n*, 413 U.S. at 558. This rule was specifically aimed at ending the "tendency on the part of Federal officers to meddle with the political actions of citizens" and promoting "a more vigorous and general condemnation of the practice by the public[.]" U.S. Civ. Serv. Comm'n, First Annual Report 8–9 (1883). The Commission also issued rules that selections for the civil service "on the basis of official favor and partisan influence must be suppressed by requiring examinations and other adequate tests of character and capacity as the conditions of entering this service." *Id.* at 8. As a result, the Commission worked to accomplish "the main purpose of" the Pendleton Act, which was meant to "establish a system of examinations for ascertaining the fitness of applicants for doing the public work" to "take the place of that vast machinery of patronage, largely based on official favor and social and political influence, which . . . had long been the most effective means of entering the executive service." *Id.* at 11.

The Pendleton Act expanded over time to cover a greater number of federal employees. When Congress initially passed the Pendleton Act, it applied only to custom houses and post offices with fifty or more employees. Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563, 1575 (2024) (citing Pendleton Act § 6). By 1932, the Act applied to 80% of all federal employees. *Id.* (citing Paul P. Van Riper, History of the United States Civil Service 543 (1958)).

### C. The Hatch Act

The Hatch Act of 1939 was a logical extension of the nonpartisanship principle codified in the Pendleton Act. The Hatch Act was introduced "to prevent pernicious political activities" for the entire federal service. *U.S. Civ. Serv. Comm'n*, 413 U.S. at 559–60 (quoting 84 Cong. Rec. 4191).

### i.    *Another Period of Corrosive Partisanship Gave Rise to the Hatch Act*

Prior to the Hatch Act, the federal bureaucracy had again lapsed into a period of politicization during the New Deal Era. *See* Jason Scott Smith, Building New Deal Liberalism: The Political Economy of Public Works, 1933-1956, at 163 (2006). As a part of the New Deal, President Franklin D. Roosevelt launched the Works Progress Administration ("WPA") in 1935 to employ people through government projects. Priscilla Ferguson Clement, *The Works Progress Administration in Pennsylvania, 1935 to 1940*, 95 Penn. Mag. History & Biography, 244, 244 (1971). The federal government administered the WPA, and all state or federal WPA officials were appointed by the President and approved by the Senate. *Id.* Because of President Roosevelt's political affiliation, "the political preferences of the Democratic senators predominated." *Id.* at 245 (citing Arthur W. Macmahon et al., The Administration of Federal Work Relief, at 270–74 (1941)).

Concerns about the WPA's politicization ran rampant. *Id.* at 256. WPA Director Harry Hopkins, a Democrat and friend of President Roosevelt, faced claims that he had promised jobs and promotions in exchange for votes in a number of swing states. *See id.*; *see also The History of*

*the Hatch Act*, The Postal Record (Aug. 2021), https://www.nalc.org. Congressmen received reports from "people who [were] working on the W.P.A., and those [who] [were] receiving direct relief, that intimidation, threats, and coercion ha[d] been exerted upon them respecting their vote at [] elections." *See* 84 Cong. Rec. H9604 (daily ed. July 20, 1939) (statement of Rep. Raymond Springer). "There wasn't any doubt" that "[f]ederal jobs were being awarded on the basis of political contributions." *Hatch Act Reform Amendments of 1993: Hearings Before the S. Comm. on Governmental Affairs on S. 185*, 103rd Cong., at 1–4 (1993) (statement of Sen. John Glenn).

In 1938, the Senate Campaign Expenditures Committee investigated allegations of abuse of WPA's resources to influence political outcomes. David Porter, *Senator Carl Hatch and the Hatch Act of 1939*, 48 N.M. Hist. Rev. 151, 152–53 (1973). The Committee found that WPA administrators had engaged in partisan activity to influence politics in Kentucky, Tennessee, and Pennsylvania. *See id.* at 153. This partisan political activity included threatening workers with the loss of their jobs if they did not change their party registration from Republican to Democrat and coercing workers to donate to Democratic candidates. *See id.* Senator Carl Hatch, a New Mexico Democrat who had supported New Deal projects, was a part of the Senate Campaign Expenditures Committee and drafted legislation to address the Committee's findings. *See id.*

 *ii. The Original Hatch Act*

Senator Hatch introduced the Hatch Act in 1939 "to prevent pernicious political activities" among federal employees. *U.S. Civ. Serv. Comm'n*, 413 U.S. at 560 (quoting 84 Cong. Rec. 4191). As originally passed, the Hatch Act "forbade anyone from coercing or interfering with the vote of another person and prohibited federal employees from using their official positions to influence or interfere with or affect the election or nomination of certain federal officials." *Id.* The Act further "prohibited the promise of, or threat of termination of, employment or compensation for the

purpose of influencing or securing political activity, or support or opposition for any candidate." *Id.*

In passing the Hatch Act, Congress repudiated any lingering system of "spoils and corruption" in government. In support of the law, Congressman Dewey Short explained that such a system "is not what the American people are paying taxes for." 84 Cong. Rec. 3045. Rather, "[t]hey want their Government to confine itself to administering the public business—wisely, soundly, efficiently, and economically." *Id.* And when "government diverts a dollar of the taxpayers' money from the essential functions of administration to purely political purposes, it betrays the people, betrays the Constitution, betrays the honor and dignity of the whole theory of orderly representative government." *Id.* As such, the Hatch Act represented another repudiation of partisanship in federal government, "which the American people have instinctively resisted at every opportunity since enactment of the first civil service law." *Id.* The Hatch Act was another instantiation of the "nonpartisanship principle" implicit in Congress' understanding of effective administration.

The Hatch Act was widely applauded by the public. *See* 84 Cong. Rec. 3176 (statement of Rep. George H. Bender) (noting the "favorable response to [the] proposed elimination of politics from W.P.A. activities" and that "[t]he thousands of newspaper editorials which have offered their support to the [] measure have created an issue which can no longer be ignored"). Within a few months, House and Senate bills were introduced to extend the Hatch Act to state officials to "stamp out pernicious political activity in State positions" and align with the Hatch Act's focus on "clean politics[.]" 84 Cong. Rec. 3855 (statement of Rep. Jennings Randolph). Within a year, that law had passed. *See* 54 Stat. 767 (1940) (extending Hatch Act provisions to certain State employees).

### iii.    Subsequent Amendments to the Hatch Act

Congress and the Executive have reviewed and amended the Hatch Act a number of times but have never diluted the primary thrust of the Act—a prohibition on federal employees from using their official role to engage in partisanship. *See, e.g.*, *Message from the President of the United States: Veto of Hatch Act Repeal*, H.R. Doc. No. 94-449, at III–IV (1976) (President Ford vetoed a bill to "essentially repeal" the Hatch Act because "politicizing the Civil Service is intolerable."). In amending the Hatch Act, Congress and the Executive have ensured that federal employees can engage politically in their private lives, but that such engagement does cross over into their duties as public servants.

By 1993, Congress had found that the Hatch Act had "protected the Federal employee, fostered a more effective workforce, and enhanced the confidence of the citizenry in the nonpartisan administration of Government." *Hatch Act Reform Amendments of 1993: Hearings Before the S. Comm. on Governmental Affairs on S. 185*, 103rd Cong., at 10 (1993) (statement of Sen. William Roth). But, in doing so, Congress had blanketly prohibited federal employees from engaging in political action of any sort, even in their private lives. Rather than continue to deprive civil servants of the opportunity to engage in partisan conduct in their private lives, Congress decided to do away with the "sledgehammer approach" of banning all partisan politics for civil servants and embrace a "scalpel" approach that allowed federal employees to engage in some partisan politics in their private lives while off duty and off government premises. *Hatch Act Reform Amendments of 1993: Hearings Before the S. Comm. on Governmental Affairs on S. 185*, 103rd Cong., at 80 (1993) (statement of Sen. Joe Lieberman); Katherine Shaw, *Partisanship Creep*, 118 Nw. L. Rev. 1563, 1580 (2024) (citing An Act to Amend Title 5, United States Code, to Restore to Federal Civilian Employees Their Right to Participate Voluntarily, as Private Citizens, in the

Political Processes of the Nation, to Protect Such Employees from Improper Political Solicitations, and for Other Purposes, Pub. L. No. 103-94, § 7324(a), 107 Stat. 1001, 1003 (codified at 5 U.S.C. § 7324(a))); *see also* Hatch Act Reform Amendments of 1993, H.R. 20, 103rd Cong. § 2 (1993).

By amending the Hatch Act in 1993, Congress carefully sought to "strike[] the right balance between guaranteeing the rights of federal employees" to engage in political speech "and protecting the integrity of the civil service" from partisanship. Cong. Rec. S. 10012, at 10046 (May 10, 1990). But, as President Clinton explained when signing these amendments of the Hatch Act into law, "[t]he Federal workplace, where the business of our Nation is done will still be *strictly off limits* to partisan political activity." Remarks on Signing the Hatch Act Reform Amendments of 1993, 29 Weekly Comp. Pres. Doc. 2012 (Oct. 6, 1993) (emphasis added). Implicit in President Clinton's remarks is the premise that the "business of our Nation" in everyday governance must be separated from partisanship, as embodied by a nonpartisan civil service.

As it currently stands, the Hatch Act prevents an employee from engaging in "political activity" while "on duty"; "in any room or building occupied in the discharge of official duties"; "while wearing a uniform or official insignia identifying the office or position of the employee"; or "using any vehicle owned or leased by the Government of the United States or any agency or instrumentality thereof." 5 U.S.C. § 7324(a). The Office of Special Counsel ("OSC") is an independent agency that has the sole, nondiscretionary power to investigate "any allegation concerning political activity" prohibited under the Hatch Act. 5 U.S.C. § 1216. If OSC charges an employee with a violation of the Hatch Act, the Merit Systems Protection Board adjudicates the charges. 5 U.S.C. §§ 1215, 1504–1508, 7321–7326. The Hatch Act does not include a private right of action. 5 U.S.C. § 1504; *see also Komatsu v. City of New York*, No. 20-cv-07046, 2021 WL 3038498, at *14 (S.D.N.Y July 16, 2021) ("The government has exclusive enforcement authority

over Hatch Act violations; thus, there is no private right of action . . . to enforce it."). But any organization or individual can submit a complaint alleging that a federal employee has violated the Hatch Act. U.S. Office of Special Counsel, *How to File a Hatch Act Complaint*, https://osc.gov/Services/Pages/HatchAct-FileComplaint.aspx (last visited Oct. 20, 2025).

## II.    The Trump Administration Has Abrogated the Nonpartisanship Principle.

The Trump Administration has led an unprecedented assault on longstanding nonpartisan norms in the Executive Branch. Administration officials have routinely flouted the legal constraints of the Hatch Act, transformed sites of governance into sites of partisan campaigning, and now, seek to compel criticism of an opposing political party from unwilling civil servants. Such efforts are corrosive to Americans' trust in a politically neutral and expert bureaucracy. Further, they run contrary to decades-old laws and entrenched norms that promote nonpartisanship in government service. *See supra*, Section I.

OSC found over a dozen violations of the Hatch Act by senior administration officials during the first Trump Administration.[2] Such violations often involved appearing in an official capacity while promoting the election or defeat of candidates for partisan political office. For

---

[2] *See* U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Mar. 6, 2018), https://osc.gov; U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (June 13, 2019), https://osc.gov; U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Dec. 7, 2020), https://osc.gov; U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Feb. 12, 2021), https://osc.gov; U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump Administration Officials During the 2020 Presidential Election, at 2 (Nov. 9, 2021), https://osc.gov (concluding "at least 13 senior Trump administration officials" violated the Hatch Act, and that "they did so with the administration's approval"); U.S. Office of Special Counsel, Letter on Prohibited Political Activity Under the Hatch Act to the President (Feb. 12, 2021), https://osc.gov; U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump Administration Officials During the 2020 Presidential Election, at 2 (Nov. 9, 2021), https://osc.gov (concluding "at least 13 senior Trump administration officials" violated the Hatch Act, and that "they did so with the administration's approval").

example, former U.S. Ambassador to Denmark, Carla Sands, used her official, government Twitter account to both criticize Democratic Party presidential candidates and arguably solicit political contributions for President Trump's 2020 campaign. *See* U.S. Office of Special Counsel, Report on Prohibited Political Activity Under the Hatch Act (The Honorable Carla Sands), at 5-6 (Feb. 12, 2021), https://osc.gov. Senior Counselor to the President, Kellyanne Conway, was an egregious violator of the Hatch Act during the President's first term. *Amicus curiae* CLC filed three separate complaints to OSC detailing Conway's obvious use of her official authority (using her official title and appearing on television in front of the White House) to advocate for or against the election of political candidates. *See* CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (Nov. 29, 2017), https://perma.cc/3B4P-HJPT; CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (Dec. 7, 2017), https://perma.cc/KVR5-S7GB; CLC Complaint to OSC Regarding Kellyanne Conway Hatch Act Violation, Campaign Legal Ctr. (May 8, 2019), https://campaignlegal.org. In response, OSC found "multiple violations" of the Hatch Act, and recommended Kellyanne Conway's removal from office, in part due to her repeated unwillingness to modify her partisan behavior despite multiple warnings by OSC. *See* U.S. Office of Special Counsel, Report on Prohibited Political Activity 2 (OSC File Nos. HA-19-0631 & HA-19-3395) (May 30, 2019), https://osc.gov. Despite repeated recommendations by OSC to the President to discipline these high-level officials, President Trump did not take any action to enforce them.[3]

---

[3] The Office of Special Counsel may not prosecute persons in a "confidential, policy-making, policy-determining, or policy-advocating position appointed by the President, by and with the advice of the Senate," and may only submit a report to the President recommending disciplinary action. *See* 5 U.S.C. § 1215(b). Due to constitutional concerns with the MSPB disciplining senior presidential appointees, OSC has extended its report-only policy such officials. *See* 2 Op. Off. Legal Counsel 107, 108–09 (1978).

The Trump Administrations have also sought to transform sites of governance into sites of political idolatry. In 2020, President Trump chose to host portions of the Republican National Convention at the White House. While the Office of Special Counsel found existing law to be "unclear" as to whether certain spaces at the White House may be used for campaign events, the event represented a vast departure from established norms of separation between the Office of the Presidency and bids for re-election. *See* U.S. Office of Special Counsel, Investigation of Political Activities by Senior Trump Administration Officials during the 2020 Presidential Election 55 (Nov. 9, 2021); Shannon Pettypiece, *White House transforms from people's house to campaign venue*, NBC News (Aug. 23, 2020), https://perma.cc/T4WY-FDPW. In recent months, the Departments of Labor and Agriculture unfurled massive banners on government buildings plastered with the President's face. *See* Martha McHardy, *Giant Donald Trump Portrait Draped Over Department of Labor Building in DC*, Newsweek (Aug. 26, 2025), https://www.newsweek.com/department-labor-trump-portrait-2119185. California Senator Adam Schiff estimates that over $50,000 of taxpayer funds have been spent on contracts for the banners advancing a partisan message. *See* Off. of Sen. Adam Schiff, Propaganda: How the Trump Administration is Breaking the Law and Wasting Taxpayer Dollars with Giant Banners of Donald Trump (Sep. 2025), https://www.schiff.senate.gov.

The current Trump Administration is increasingly using the levers of government to advance avowedly partisan messaging. For example, Secretary of Homeland Security Kristi Noem instructed airports across the country to play a "public service" video to blame Democrats in Congress for the ongoing government shutdown. *See* Letter from Senators Richard Blumenthal, et al. to Kristi Noem (Oct. 15, 2025), https://www.blumenthal.senate.gov. Several airports have refused to play the video on the grounds that they cannot show content "that endorses or opposes

14

any named political party" and that they must "remain mindful of the Hatch Act's restrictions." Adriana Gomez Licon & Rio Yamat, *Some airports refuse to play Noem video on shutdown impact, saying it's political*, Associated Press (Oct. 14, 2025), https://apnews.com (quoting airport representatives). Likewise, the Administration is using main landing pages for government agencies with critical, public-facing missions to espouse explicitly partisan messages concerning the government shutdown.[4] *See Seven More Complaints Filed for Trump Administration Hatch Act Violation*, Public Citizen (Oct. 2, 2025), https://www.citizen.org. And just this week, Democratic-led states have retaliated by publishing avowedly partisan messages on state websites for federal-state assistance programs like Medicaid and the Supplemental Nutrition Assistance Program ("SNAP"), further eroding the nonpartisanship that promotes all Americans' trust in the administration of federal funds. *See* Campbell Robertson and Eileen Sullivan, *Some States with Democratic Governors are Posting Partisan Shutdown Messages on Official Websites*, N.Y. Times (Oct. 20, 2025), https://www.nytimes.com. Each of these actions evince a disregard for the nonpartisanship principle that official government authority should not be used to advance partisan ends of affecting election results.

### III.    Federal Employees' "Official Duties" Do Not Encompass Partisan Speech.

Through the evolution of the nonpartisanship principle, federal ethics law, and First Amendment doctrine, every branch of government has recognized the critical importance of balancing two weighty interests: the State's interest in maintaining an effective and nonpartisan civil service and federal civil servants' interest in engaging in First Amendment protected political

---

[4] OSC has previously issued advisory opinions that establish that "[c]riticism or praise that is directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group *is political activity*." U.S. Office of Special Counsel, Clarification of November 27, 2018 Email (Nov. 30, 2018), Hatch Act Advisory Opinion (emphasis added).

speech and expression. Here, though, no balancing is required. The argument that the federal government can now compel employees to engage in partisan speech as a part of their official duty undermines not just one, but both important interests.

The Hatch Act Amendments of 1993 demonstrate a Congressional mandate to maintain the freedom of federal employees to engage in *voluntary* political activities only outside of work hours. *See supra* Section I(C)(iii). But by placing partisan words in the mouths of its employees, the Trump Administration muddies the waters and impedes federal employees' ability to advance a clear and consistent partisan viewpoint in their private lives. Moreover, the longstanding commitment of our government to the principle of nonpartisanship in the civil service establishes that the State has no valid interest in requiring civil servants to engage in flagrantly partisan speech at work. *See supra* Section I. In fact, Congressional mandate via the Hatch Act subjects partisan action to discipline, up to and including termination from employment. Despite the Trump Administration's efforts to erode the nonpartisanship principle in their administration, *see supra* Section II, any attempt to compel partisan speech by civil servants in their official capacity would subvert the basic aim of Congress in the Hatch Act.

The Supreme Court's approach to regulating government employee speech mirrors that of the Hatch Act. The Court looks at whether a public employee is speaking as part of their employment duties to determine if the speech is protected by the First Amendment. *See Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006). *Garcetti* instructs that the "controlling factor" is whether the "expressions were made pursuant to [the employee's] duties[.]" *Id.* at 411. In other words, the relevant threshold inquiry for whether a government employee possesses First Amendment protections (either to speak or refrain from speaking) is whether the speech at issue falls within the duties specific to their position. The *Garcetti* Court considered but rejected the notion that all

"expressions related to the speaker's job" would fall under their official duties and thereby be unprotected from First Amendment scrutiny. *Id.* at 421. Government Defendants' suggestion that any message from "a government owned and operated email account . . . related to the government employee's official working status" is not protected, *see* ECF 15-1 at 22, would replicate these rejected rules through a different formulation.

The Supreme Court has refrained from "articulat[ing] a comprehensive framework for defining the scope of an employee's duties," *Garcetti*, 547 U.S. at 425, but the Court instructed that the tasks "an employee actually is expected to perform" are chiefly relevant. *Id.* at 424–25. In *Garcetti*, the Court found that when a deputy district attorney wrote a memo expressing concerns over investigatory misconduct in a pending case, the prosecutor was acting within the scope of his ordinary duties. *Id.* at 414, 421. However, in *Lane*, the Court found that a public employee's grand jury testimony concerning fraud at his government workplace was *not* within that employee's "ordinary job duties," and thus warranted greater First Amendment protection. *Lane v. Franks*, 573 U.S. 228, 238 (2014). The government has not—and cannot—argue that it is within the ordinary job duties for staff at the Department of Education to opine on whether one party or the other is more responsible for a government shutdown.

Given the careful balance that Congress and the Executive have struck in allowing federal employees to engage in partisan speech and the First Amendment caselaw supporting that balance, there is no plausible basis to conclude that federal employees must engage in partisan speech as a part of their official duties. Such action does not advance the "integrity" of government service. It accomplishes precisely the opposite, corroding citizens' trust that the business of governing is detached from the business of partisan campaigning.

**CONCLUSION**

*Amicus* respectfully requests that the Court considers the longstanding nonpartisanship principle in rendering its decision and does not hold that compelled, partisan speech can fall under the official duties of a federal employee.


Dated: October 24, 2025                    Respectfully submitted,

                        By:    */s/ Renata O'Donnell*
                               Renata O'Donnell (D.D.C. Bar ID 1723929)
                               Dana Paikowsky
                               Kedric Payne
                               Robert Brent Ferguson
                               Dana Paikowsky
                               CAMPAIGN LEGAL CENTER
                               1101 14th St. NW, Suite 400
                               Washington, DC 20005
                               Tel: 202-736-2200
                               rodonnell@campaignlegalcenter.org
                               dpaikowsky@campaignlegalcenter.org
                               kpayne@campaignlegalcenter.org
                               bferguson@campaignlegalcenter.org

                               *Counsel for Amicus Curiae Campaign Legal Center*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2025, I electronically filed a copy of the foregoing

Brief Amicus Curiae using the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 24, 2025

By:    */s/ Renata O'Donnell*
Renata O'Donnell (D.D.C. Bar ID 1723929)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200

*Counsel for Amicus Curiae Campaign Legal Center*

19