**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, |
| *Plaintiff*, |
| v. |
| U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary of Education, |
| *Defendants*. |

Case No. 1:25-cv-3553-CRC

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.       DISTRICT COURT JURISDICTION IS PRECLUDED UNDER THE
            FEDERAL SERVICE LABOR MANAGEMENT RELATIONS
            STATUTE AND THE CIVIL SERVICE REFORM ACT.................................... 2

    II.      AFGE'S CHALLENGE TO THE ORIGINAL OUT-OF-OFFICE
            MESSAGE IS PRUDENTIALLY MOOT AND ANY CHALLENGE AS
            TO THE NEW MESSAGE IS NOT PROPERLY PLED IN THE
            COMPLAINT. ............................................................................................. 9

    III.    THE DEPARTMENT'S OUT-OF-OFFICE MESSAGES ARE NOT
            PROTECTED UNDER THE FIRST AMENDMENT. ....................................... 10

    III.    AFGE'S REQUESTED INJUNCTIVE RELIEF IS OVERBROAD. .................. 16

CONCLUSION ...................................................................................................................... 17

CERTIFICATE OF SERVICE

## INTRODUCTION

The substance of this lawsuit is about whether the U.S. Department of Education's (the "Department") out-of-office messages—automatic emails sent by official government email accounts, at the government's direction, to convey a government message—constitute compelled speech of individual employees in violation of the First Amendment. But the Court cannot reach that issue because this issue involves an employment-related dispute to be channeled through the comprehensive and exclusive review provisions of the Federal Service Labor-Management Relations Statute ("FSLMRS") and the Civil Service Reform Act ("CSRA"), and even if it could, the Department's actions are not subject to the First Amendment. The American Federation of Government Employees' ("AFGE") responsive brief does not refute these dispositive issues, and thus its motion for summary judgment ought to be denied and Defendants cross-motion for summary judgment granted.

AFGE's primary jurisdictional objection is that the administrative bodies established by the FSLMRS and CSRA are not currently functioning because of the lapse in appropriations, but even if this is true, the Supreme Court has instructed that the relevant question is whether the statutory scheme channels such challenges to other administrative bodies, not whether a plaintiff can get relief in a specific case. Here, as the Supreme Court and D.C. Circuit have repeatedly held, Congress intended such claims to go first to such bodies, not federal district courts in the first instance. Moreover, this dispute—concerning work-related out-of-office messages—falls within the scope of these statutes.

Finally, the merits favor Defendants. To the extent these government out-of-office emails are attributable to the individual employees of the Department—and AFGE has not established that they are—the expressions conveyed occur pursuant to their work duties. And the Supreme

Court has made clear that speech by public employees expressed pursuant to their official duties enjoys no First Amendment protection. Those decisions foreclose AFGE's First Amendment claim. And even if the automated out-of-office email responses could be characterized as partisan political rhetoric, that would be at most a potential statutory matter under the Hatch Act. AFGE suggests as much, but that suggestion does not help its First Amendment claim.

For these reasons, this Court should deny AFGE's motion for summary judgment and grant Defendants' cross motion for summary judgment.

**ARGUMENT**

## I.     DISTRICT COURT JURISDICTION IS PRECLUDED UNDER THE FEDERAL SERVICE LABOR MANAGEMENT RELATIONS STATUTE AND THE CIVIL SERVICE REFORM ACT.

**A.** AFGE's claims must be brought through the FSLMRS's review scheme, which is "exclusive with respect to claims within its scope," including "constitutional claims." *AFGE v. Trump*, 929 F.3d 748, 755–59 (D.C. Cir. 2019). As explained in Defendants' opening brief, the FSLMRS (as part of the broader CSRA) contains specific mechanisms that would allow AFGE to seek administrative and judicial review of this First Amendment claim. ECF No. 15-1 at 7–17. In particular, AFGE can bring a dispute through a grievance resolution and arbitration procedure under its collective bargaining agreement, asserting that Defendants have violated its members' First Amendment rights. *Id*. at 10 (citing 5 U.S.C. § 7121). Likewise, AFGE can assert that its members have been "affected by a prohibited personnel practice" based on the allegation that Defendants' out-of-office emails have "coerce[d] political activity." *Id.* at 11 (citing 5 U.S.C. § 2302(b)(3)). From there, AFGE can seek review of the arbitrator's decision before the Federal Labor Relations Authority ("FLRA"), followed by judicial review (if necessary) by the court of appeals. *Id*. at 9 (citing 5 U.S.C. §§ 7105(a)(2), 7123(a)). Similarly, the CSRA provides statutorily covered employees themselves (both those with union representation and those

without) a review mechanism over any allegations of prohibited personnel practices based on

"coerce[ed] political activity," as well as alleged First Amendment violations. *Id*. at 13–15.

Accordingly, this Court lacks jurisdiction because Congress's intent to preclude district court

jurisdiction is "fairly discernible in the statutory scheme," and AFGE's claim is "the type

Congress intended to be reviewed within this statutory structure." *Thunder Basin Coal Co. v.*

*Reich*, 510 U.S. 200, 207, 212 (1994).

AFGE does not dispute that those administrative channels exist to review its First

Amendment claim. Instead, it primarily argues that "[t]he government shutdown has frozen the

CSRA's adjudicatory mechanism and made it unavailable to address the Department's conduct

. . ." ECF No. 16 at 3. And "[w]hen the CSRA's remedial scheme is not an option," AFGE

maintains, "Congress cannot have intended to preclude district-court jurisdiction." *Id*. AFGE is

mistaken.

In support of this argument, AFGE relies on the Fourth Circuit's decision in *National*

*Ass'n of Immigration Judges v. Owen* ("*NAIJ*"), 139 F.4th 293 (4th Cir. 2025). There, to help

determine whether the claims asserted in that litigation fall outside of district court jurisdiction

under the CSRA, the Fourth Circuit remanded to the district court to consider the first step of the

*Thunder Basin* inquiry—whether Congress' intent to preclude district-court jurisdiction is "fairly

discernible in the statutory scheme[]"—in light of current events.  *Id*. at 303–04 (quoting

*Thunder Basin*, 510 U.S. at 207). Specifically, the Fourth Circuit held that although the Supreme

Court "has recognized that the CSRA, when functioning as Congress intended, was designed to

strip district courts of jurisdiction," the removal of the Special Counsel and of two members of

the MSPB such that it lacks a quorum, "raise[s] serious questions as to whether the CSRA's

adjudicatory scheme continues to function as intended." *NAIJ*, 139 F.4th at 304–05.[1] For that

reason, the Fourth Circuit remanded the appeal to the district court "to conduct a factual inquiry

whether the CSRA continues to provide a functional adjudicatory scheme," and, if warranted, "a

new examination of Congressional intent" as to the CSRA. *Id*. at 308.

      The reasoning underlying the Fourth Circuit's remand in *NAIJ* is unpersuasive, and this

Court should decline AFGE's invitation to adopt that novel functional interpretation of the first

step in the *Thunder Basin* test. Indeed, *NAIJ* explicitly acknowledged that the Supreme Court's

decisions in *United States v. Fausto*, 484 U.S. 439 (1988) and *Elgin v. Dep't of Treasury*, 567

U.S. 1 (2012) would have "made our analysis at step one of the *Thunder Basin* test simple." 139

F.4th at 305. The court conceded that "it has been well-established that Congress's intent for the

CSRA to preclude district court jurisdiction is 'fairly discernible in the statutory scheme.'" *Id*.

(quoting *Elgin*, 567 U.S. at 10–11). That should have been the end of the analysis. But, instead,

the court went on to declare, "[t]hat conclusion can only be true . . . when the statute functions as

Congress intended." *Id*. By introducing a functional, rather than statutory, analysis into the

inquiry, *NAIJ* dramatically departed from Supreme Court precedent. The Fourth Circuit's

decision cannot be reconciled with *Fausto* and *Elgin*, which instruct that the question of

Congress's intent depends on an analysis of the statute itself—not on any fact-based analysis of

the implementation of that statute. In *Fausto*, the Court relied on "the statutory language" and

"the structure of the statutory scheme" to conclude that Congress intended to bar excepted

service employees from seeking judicial review of adverse employment actions. 484 U.S. 439,

---

[1] The MSPB's quorum has been restored with the recent confirmation of a second board member. *See* Nomination of James Woodruff II for Merit Systems Protection Board, 119th Cong. PN55-49 (2025). Available at https://www.congress.gov/nomination/119th-congress/55/49

449 (1988). And in *Elgin*, the Court looked to "the CSRA's text, structure, and purpose" to conclude that Congress likewise intended to preclude constitutional challenges to covered actions. In other words, it was the "elaborate" framework and "painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions" that render the OSC and MSPB the "exclusive forum" for review of agency personnel action. *Elgin*, 567 U.S. at 10–12, 14.

By contrast to the comprehensive, reticulated nature of the scheme Congress created in the CSRA, functional questions about OSC's and MSPB's staffing, quorum, and removal protections as they operate at a specific moment in time are not part of the analysis. And the Supreme Court has never suggested anything to the contrary. *See generally Elgin*, 567 U.S. at 1; *Fausto*, 484 U.S. at 439–55. Accordingly, this Court should not follow *NAIJ* by engaging in a similar factual inquiry into whether the CSRA or the FSLMRS currently "function[] as Congress intended" in light of the lapse in appropriations because there is "no basis, statutory or otherwise, to say that a court's subject matter jurisdiction can turn on the presence or absence of political gridlock." *See Jolley v. United States*, 549 F. Supp. 3d 1, 6 (D.D.C. 2021).

Even accepted on its own terms, AFGE's argument fails. AFGE complains about the "total unavailability of the administrative review process," ECF No. 16 at 4, pointing out that the MSPB, the OSC, and the FLRA are all closed due to the lapse in appropriations. AFGE asserts that because "the CSRA's administrative process is unavailable until the shutdown is over[]" it potentially leaves it "with no opportunity to obtain a remedy at all." *Id*. at 4–5. But, at the outset, there is internal tension in AFGE's argument. On one hand, this argument is premised on the fact that once the lapse in appropriations has ended, and the Department rescinds the out-of-office messages at issue, the case becomes moot. Consequently, by AFGE's telling, a court can no

longer offer any remedy for its First Amendment claim. But on the other hand, AFGE signals

that it disagrees with the Department's "assessment of future mootness," ECF No. 16 at 5 n.3,

thus indicating that its position is that there *can* be an effective judicial remedy after the lapse in

appropriations ends. Because AFGE's argument is premised on the idea that administrative relief

cannot be available after the lapse ends (because of its view that the Congressional channeling

schemes are unavailable at this moment of time), and yet its legal position is apparently that

judicial relief by this court *can* extend beyond the lapse, its temporal limitation argument ought

to be rejected.

      In any event, AFGE's argument conflicts with D.C. Circuit precedents that plainly limit

government employees to the processes and remedies of the CSRA, even if that exclusivity

closes the courthouse doors to would-be plaintiffs. That is because "it is the comprehensiveness

of the statutory scheme involved, not the 'adequacy' of the specific remedies thereunder, that

counsels judicial abstention. *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 638

(D.C. Cir. 2013) (quoting *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (*en banc*));

*Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009)

("Congress designed the CSRA's remedial scheme with care, intentionally providing — and

intentionally not providing — particular forums and procedures for particular kinds of claims."

(cleaned up)). In fact, the CSRA "'can preclude a claim from being brought in a district court

even if it *forecloses* the claim from administrative review' and provides no other way to bring the

claim." *AFGE*, 929 F.3d at 756 (quoting *Air Force*) (emphasis in *AFGE*)). Indeed, in *AFGE*, the

D.C. Circuit recognized that it had held that "unions were required to raise their challenges

through the scheme even if that made it *impossible* to obtain particular forms of review or relief."

*Id*. (emphasis in original). Thus, the D.C. Circuit's precedents foreclose AFGE's argument here.

**B.** Next, applying the *Thunder Basin* factors, AFGE's claim is of the type that Congress intended to be reviewed within the FSLMRS's statutory structure. ECF No. 15-1 at 10–13. AFGE, however, argues that "[e]ven if Congress could have intended for the currently unavailable CSRA mechanism to continue to displace district-court jurisdiction for claims within the scope of the statute," "[e]ach of the three *Thunder Basin* factors 'point in the same direction—toward allowing district court review' of Plaintiff's claim." ECF No. 16 at 6. AFGE's argument is meritless.

For starters, AFGE invokes *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) throughout its analysis of step two of the *Thunder Basin* test. But *Axon* is inapposite here. *Axon* recognized a narrow exception to Congress's prescribed path for judicial review of agency action for facial challenges to the constitutional structure of administrative agencies' ability to operate. *Id*. at 897 (holding that "district courts have jurisdiction to hear" and "resolve the parties' constitutional challenges to the Commissions' structure"). But AFGE is not asserting a structural challenge to the FLRA or MSPB; it is arguing that employment-related activities within the heartland of those agencies' statutory mandate to review are themselves unconstitutional. Accordingly, AFGE's alleged First Amendment violation is far from the sort of "'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Id.* at 192. On top of that, although AFGE relies on *NAIJ* as to *Thunder Basin*'s first step, it notably fails to acknowledge that *NAIJ* concluded that all three factors of *Thunder Basin*'s second step were met. *See NAIJ*, 139 F.4th at 308–13. Likewise, here, consideration of the *Thunder Basin* factors confirms that AFGE's claim is precluded by the FSLMRS.

First, a finding of the preclusion would not "foreclose all meaningful judicial review." As discussed, the FSLMRS grants AFGE several avenues to challenge the alleged First Amendment

violation before either the FLRA or MSPB, with review ultimately at either the court of appeals or Federal Circuit, respectively. ECF No. 15-1 at 11–12. AFGE disagrees. It urges that judicial review would come too late to be meaningful and that "[t]he First Amendment injury here . . . is uniquely tied to the very government shutdown that also renders administrative review impossible." ECF No. 16 at 7–8. But even assuming that administrative disputes are subject to the same mootness criteria as Article III courts, the fact that AFGE takes the position that its case is not moot even after the lapse ends indicates that its view must also be that the case is not moot at the administrative level even after the lapse ends. *Id.* at 5 n.3. And, again, this argument is substantially foreclosed by D.C. Circuit's precedent. As the D.C. Circuit held in *AFGE*, "[a]lthough the unions are not able to pursue their preferred systemwide challenge through the scheme, they can ultimately obtain review of and relief from the executive orders by litigating their claims in the context of concrete bargaining disputes. Such review, according to *Thunder Basin*, *Air Force*, and *Loy*, qualifies as meaningful." 929 F.3d at 759; *cf. Krafsur v. Davenport*, 736 F.3d 1032, 1037 (6th Cir. 2013) ("This case involves only a narrow limit upon judicial review. Krafsur may still take his case to the Federal Circuit, so long as he gets clearance from the Office of Special Counsel.").

Second, AFGE contends that its claim is "wholly collateral" to the statutory review scheme and "outside the agency's expertise." ECF No. 16 at 9–11. But it advances no meaningful argument. As the Sixth Circuit has observed, "[t]he text of § 2302 (which deals with prohibited personnel practices) signals that the Act's exclusivity extends to constitutional challenges. Covered prohibited practices include many actions that would offend the Constitution." *Krafsur*, 736 F.3d at 1039 (citing, *inter alia*, "§ 2302(b)(3) (coercing an employee's political activity)."). Indeed, "[t]hese provisions show that Congress anticipated that

the [OSC] and [the MSPB] would handle constitutional as well as statutory issues." *Id*. If that were not enough, the Supreme Court in *Elgin* underscored "that the MSPB routinely adjudicates some constitutional claims, such as claims that an agency took adverse employment action of an employee's First or Fourth Amendment rights, and that these claims must be brought within the CSRA scheme." 567 U.S. at 12. So too here with respect to the adjudication of AFGE's First Amendment claim against the Department. There is, therefore, no merit to AFGE's argument that its First Amendment claim is wholly collateral to or beyond the expertise of the FLRA or MSPB.

Lastly, AFGE denies that an administrative claim regarding a prohibited personnel practice based on coerced political activity under § 2302(b)(3) bears any resemblance to its First Amendment challenge. ECF No. 16 at 9–10. But, again, the FSLMRS contains a specific mechanism that allows employees to seek redress for substantially similar conduct to the one alleged here. Indeed, AFGE's collective bargaining agreement with the Department appears to expressly address alleged prohibited personnel practices under § 2302(b)(3). *See* Collective Bargaining Agreement Between the U.S. Department of Education and the American Federation of Government Employees Local 252, at 22–23 (effective Jan. 17, 2025). At bottom, this argument is nothing more than an attempt to circumvent Congress's comprehensive and exclusive channeling regime.

## II. AFGE'S CHALLENGE TO THE ORIGINAL OUT-OF-OFFICE MESSAGE IS PRUDENTIALLY MOOT AND ANY CHALLENGE AS TO THE NEW MESSAGE IS NOT PROPERLY PLED IN THE COMPLAINT.

As Defendants previously argued, this Court should exercise its discretion and resolve AFGE's First Amendment challenge as prudentially moot. ECF No. 15-1 at 17–20. This Court should withhold deciding this case because, first, Defendants have revised the out-of-office

9

message at issue in the complaint, addressing the specific First Amendment concerns about first-person language of the original (now changed) out-of-office message  AFGE raised in its complaint, ECF No. 1, ¶ 46, and, second, this case is likely to become constitutionally moot once government operations are restored and the Department withdraws the out-of-office messages. And separately, this Court should decline to address any constitutional claim as to the operative message because it is not specifically pleaded in the complaint.

AFGE contests all these points. In particular, it quibbles about what it apparently views as Defendants' efforts to modify the out-of-office messages that might otherwise "justify this Court staying its hand." ECF No. 16 at 12. The Department, however, addressed AFGE's principal grievances by tailoring the initial out-of-office message. *E.g.* ECF No. 9-1 at 11; ECF No. 1, ¶ 46.  The Department disagrees that much more is required to invoke prudential mootness. Moreover, although AFGE contests "Defendants' premature assessment of mootness," ECF No. 16 at 13, prudential mootness is further in play because "[e]ven greater caution is warranted because this case requires consideration of a 'constitutional issue of first impression.'" *Gordon v. Holder*, 85 F. Supp. 3d 78, 85 (D.D.C. 2015).

Finally, AFGE cites no authority for the proposition that this Court can render a judgment on the merits as to the currently operative out-of-office message where the Complaint challenges only the earlier version. AFGE could have amended its complaint as of right to include the revised version of the automatic email, but it elected not to do so. This Court should, therefore, decline to entertain any challenge as to the current message.

### III.    THE DEPARTMENT'S OUT-OF-OFFICE MESSAGES ARE NOT PROTECTED UNDER THE FIRST AMENDMENT.

Even if the out-of-office messages were reviewable by this Court in the first instance, they do not violate the First Amendment because these emails—sent by official government

email addresses, for official government purposes, at the government's direction—constitute government speech. ECF No. 15-1 at 20–28. These emails are not private messages conveying information on the employee's personal behalf on matters of public concern. It is true, the content of the automated out-of-office message includes what AFGE calls "a partisan attack," ECF No. 16 at 19, but that does not transform government speech into the private speech of its employees. As argued previously, to the extent the challenged statements within the out-of-office messages raise any separate issues—for example, AFGE invokes the Hatch Act, *e.g.* ECF No. 9-1 at 13–16; ECF No. 16 at 20—they do not implicate the First Amendment. ECF No. 15-1 at 27. And this Court should reject any attempt by AFGE to dress its complaint about any perceived Hatch Act violation in First Amendment garb.

AFGE denies that the out-of-office messages are government speech. It also disagrees that the factors the Supreme Court articulated in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) and *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) apply under these circumstances. But those factors are still relevant here. Critically, the analysis serves to highlight the fact that government speech can contain political messages, even messages that some individuals might find controversial. *See*, *e.g.*, *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 21 (D.D.C. 2021). Thus, those sorts of cases, as Defendants argued before, ECF No. 15-1 at 21–22, establish that government speech does not hinge on the political or controversial nature of the message conveyed. ECF No. 15-1 at 22. And, in any event, even applying *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878 (2018), that analysis still shows that the out-of-office messages constitute government speech, favoring Defendants. *See* ECF No. 15-1 at 25–27.

Briefly, in *Garcetti*, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 585 U.S. at 421. The Court restated this principle in *Janus*, observing that "in general when public employees are performing their job duties, their speech may be controlled by their employer." 585 U.S. at 909–10. "The employee's words," the Court explained, "are really the words of the employer" because "[t]he employee is effectively the employer's spokesperson." *Id*. at 910.

There is no meaningful dispute here that the Department implemented these out-of-office messages through the government email accounts of its employees to communicate a message about the lapse in appropriations. Nor is there any dispute that the message itself was drafted by and established by the Department. Forrester Decl. ¶ 5. It is true that part of that message included content that AFGE criticizes as "political opinion about the cause of the shutdown . . ." ECF No. 16 at 19.  But that the government's message may be objectionable to an individual employee does not mean that the message is actionable under the First Amendment. *See Penkoski*, 548 F. Supp. 3d at 21 ("So aside from a few limited exceptions, offensive speech by the government is cured at the ballot box, not in the courtroom."). Applying those basic facts to *Garcetti* shows that the Department's out-of-office messages constitute "speech that owes its existence to a public employee's professional responsibilities." 547 U.S. at 411; *see Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529–30 (2022) ("In other words, the prosecutor's memorandum was government speech because it was speech the government 'itself ha[d] commissioned or created' and speech the employee was expected to deliver in the course of carrying out his job."). Indeed, the fact that the Department implemented these messages directly

as opposed to instructing its employees to set these messages verbatim only emphasizes that this message constitutes government speech. *See Janus*, 585 U.S. at 910 ("the employee's words are really the words of the employer.").

AFGE vigorously contests Defendants' explanation that the Department-implemented out-of-office messages (sent on a government email system on behalf of the government to convey a government message regarding its status during lapse in appropriations) constitute government speech. It charges that "the Department abstracts the issue to a higher level of generality" and dismisses "the lawyerly reframing" because it "deflects the real issue." ECF No. 16 at 19. But, barbs aside, AFGE's substantive arguments lack merit. First, AFGE asserts that "[t]here is no factual dispute that transmitting a political opinion about the cause of the shutdown—the speech at issue here—is outside the scope of a Department employee's job duties." *Id*. But this argument misses the point.

As the Supreme Court emphasized, "the critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Kennedy*, 597 U.S. at 529 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014) (cleaned up)). The Supreme Court underscored that "[t]he proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424. And it warned that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform[.]" *Id*. at 424–25. Moreover, as the Supreme Court continued, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id*. at 425. Here, by fixating on whether "[s]ending messages blaming 'Democrat Senators' for the failed congressional negotiations that led to the government shutdown is . . . 'part of what the employee is paid to do[,]'" ECF No. 16 at 19 (citation omitted),

AFGE commits the exact mistake that the Supreme Court warned about by engaging in the inquiry with "blinkered focus" on the terms of formal or written job descriptions. *Kennedy*, 597 U.S. at 529; *see Garcetti*, 547 U.S. at 424–25. Granted, "transmitting partisan, political out-of-office messages" might not literally be part of an employee's written job description. But that is not "[t]he proper inquiry." *Garcetti*, 547 U.S. at 424. Conversely, following Department instructions regarding "orderly shutdown activities," and composing an out-of-office email message—regardless of the specific contents of that message—at the Department's direction does fall within the scope of an employee's official responsibilities. ECF No. 9-2, ¶¶ 6–8; *see Janus*, 585 U.S. at 909 ("Many employees, in both the public and private sectors, are paid to write or speak for the purpose of furthering the interests of their employers.").

Notably, although part of the out-of-office message includes what AFGE describes to be "partisan political statements," ECF No. 16 at 19, it cites no authority for the proposition that by injecting political opinion or some other controversial statement into a government message, the government transforms what would have otherwise been government speech into speech subject to the First Amendment. That lack of authority is not surprising. Indeed, in determining that the prosecutor's memo in *Garcetti* was written pursuant to his official duties and was, therefore, not protected by the First Amendment, the Supreme Court's decision did not turn on the substance of the memo itself. As the Supreme Court noted, "Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department." 547 U.S. at 423. "If Ceballos' superiors though the memo was inflammatory or misguided," the Supreme Court continued," "they had the authority to take the proper corrective action." *Id*. But AFGE cannot mean to suggest that the Supreme Court would have reached a different First Amendment result if the prosecutor had written his memo differently. What

mattered was "[w]hen he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id*. at 422. So too here with respect to the out-of-office messages because to the extent they are attributable to any individual employee, that is "speech made by an employee in his or her professional capacity." *Id*.[2]

Second, AFGE decries "[t]he implications of the Department's alternative framing" as "startling." ECF No. 16 at 20. It protests that "the Department could," among its parade of horribles, "require its employees to send political fundraising requests, get-out-the-vote messages, or ad hominem attacks on persons, organizations, or jurisdictions perceived to oppose the Administration's policy goals . . . and the First Amendment would offer no protection." *Id*. But these examples are a far cry from the government's automated out-of-office message at issue here.  And as Defendants pointed out in its brief, ECF No. 15-1 at 27, the Supreme Court has addressed this precise point in both *Garcetti* and *Janus*. In *Garcetti*, the Court rejected "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties." It also made clear that "[c]ases involving government attorneys implicate additional safeguards in the form of, for example, rules of conduct and constitutional obligations *apart from* the First Amendment." *Garcetti*, 547 U.S. at 425 (emphasis added).

---

[2] AFGE denies that its declarations are insufficient to show that members of the public would assume that such messages are, in fact, conveying the personal views of employees rather than the views of the government. ECF No. 16 at 21 n.8. But the declarations plainly do not establish how the public would reasonably interpret the out-of-office messages. AFGE has the burden to establish a First Amendment violation, which it must support with evidence. It has not satisfied its burden here. *See Bortell v. Eli Lilly & Co.*, 406 F.Supp.2d 1, 11 (D.D.C. 2005).

It is "[t]hese imperatives," the Supreme Court underscored—not the First Amendment—that "protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions." *Id*. Similarly, in *Janus*, the Supreme Court echoed that view, stating that "[t]here are laws[,]" besides the First Amendment, "that protect public employees from being compelled to say things that they reasonably believe to be untrue or improper . . . but in general when public employees are performing their job duties, their speech may be controlled by their employer." *Janus*, 585 U.S. 909–10 (citing *Garcetti*, 547 U.S. at 425–26). Thus, to the extent that AFGE is concerned that government employees could be forced to engage in improper actions—assuming those actions are pursuant to their duties—the Supreme Court has instructed to look beyond the First Amendment for relief.

Third, where AFGE asserts that "[t]he case law is uncertain about whether government compulsion of such speech from its employees is per se unlawful," ECF No. 16 at 20–21, it overlooks *Garcetti*, which draws a clearer line than AFGE suggests. The Supreme Court delineated, "[w]hen an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing . . . When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny." *Garcetti*, 547 U.S. at 423. This case, contrary to AFGE's suggestion, is firmly in government speech territory, so no balancing is warranted.

## III.    AFGE'S REQUESTED INJUNCTIVE RELIEF IS OVERBROAD.

Finally, this Court should narrowly tailor any relief to AFGE's members. AFGE neither meaningfully contests the scope of its requested relief nor disputes this Court's obligations stated in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). Accordingly, any relief should be limited to AFGE's members only.

**CONCLUSION**

For the foregoing reasons, this Court should deny AFGE's motion for summary judgment and grant Defendants' cross motion for summary judgment.

Dated: October 24, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *James J. Wen*
JAMES J. WEN
Trial Attorney,
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 598-7361
E-mail: james.j.wen@usdoj.gov

*Counsel for Defendants*

17

**<u>CERTIFICATION OF SERVICE</u>**

I hereby certify that, on October 24, 2025, this memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *James J. Wen*__</u>
JAMES J. WEN