**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**AMERICAN FEDERATION OF**
**GOVERNMENT EMPLOYEES**,

Plaintiff,

v.

**U.S. DEPARTMENT OF EDUCATION**, *et al.*,

Defendants.

---

Case No. 25-cv-3553 (CRC)

---

## MEMORANDUM OPINION

A lapse in appropriations—more commonly known as a government shutdown—began on October 1, 2025. In advance of the shutdown, officials within the Department of Education (the "Department") instructed furloughed employees to set up an automated out-of-office e-mail message. The Department supplied a template containing factual, nonpartisan language. But shortly after the furloughed employees followed these instructions and lost access to their e-mail accounts, the Department changed the messages without the employees' knowledge or consent. The new auto-reply, standardized for all furloughed employees, states that the lapse in appropriations was caused by "Democrat Senators" who were blocking the passage of a "clean" continuing resolution.

The American Federation of Government Employees ("AFGE") claims that this sweeping, unilateral revision to the out-of-office messages compels the Department employees' speech in violation of the First Amendment. Due to the unusual posture of the case—the alleged constitutional violation will only last as long as the shutdown—AFGE immediately moved for summary judgment and requested an expedited briefing schedule. The Court agreed to accelerate the briefing timeline but permitted the government to file a cross-motion for summary

judgment.  In its cross-motion, the government identifies several jurisdictional obstacles that purportedly block the Court's path to the merits and insists that the messages do not violate the First Amendment in any event.

The Court concludes that it has jurisdiction over AFGE's claim and that the Department has infringed upon its employees' First Amendment rights.  Nonpartisanship is the bedrock of the federal civil service; it ensures that career government employees serve the public, not the politicians.  But by commandeering its employees' e-mail accounts to broadcast partisan messages, the Department chisels away at that foundation.  Political officials are free to blame whomever they wish for the shutdown, but they cannot use rank-and-file civil servants as their unwilling spokespeople.  The First Amendment stands in their way. The Department's conduct therefore must cease.

For this reason and those that follow, the Court will grant AFGE's motion for summary judgment and deny the government's cross-motion.

## I.    Background

The facts of the case are undisputed.  In March 2025, some Department employees were placed on administrative leave due to large-scale reductions in force.  See, e.g., Declaration of B. Doe ("B. Doe Decl.") ¶ 5; Declaration of E. Doe ("E. Doe Decl.") ¶ 5; Declaration of G. Doe ¶ 5. Before going on administrative leave—and losing access to their government e-mail accounts— many of these employees set an out-of-office e-mail message explaining that they could not respond to incoming messages during their absence.  See, e.g., E. Doe Decl. ¶ 5; Declaration of J. Doe ("J. Doe Decl.") ¶ 5; Declaration of L. Doe ("L. Doe Decl.") ¶ 5.  These out-of-office messages did not contain partisan or political statements.

Several months later, it was widely reported that a government shutdown was imminent. On September 30, 2025, the Department distributed information about the impending shutdown to its remaining employees. Declaration of Chase Forrester ("Forrester Decl.") ¶ 3. The Department explained that during the shutdown, some employees would continue working as "excepted employees," while others would be furloughed. Forrester Decl., Ex. A at 3–4. The Department instructed furloughed employees to set an out-of-office e-mail reply. Id. at 5–6. The instructions provided the following plain-vanilla "template verbiage" for the message:

> Hello, you have reached the [US Department of Education's Information Resource Center]. We are unable to respond to your request due to a lapse in appropriations for the Department of Education. We will respond to your request when appropriations are enacted. Thank you.

Id. at 6. Many soon-to-be-furloughed Department employees set an out-of-office message that conformed with this template. See, e.g., Declaration of C. Doe ("C. Doe Decl.") ¶ 7; Declaration of H. Doe ("H. Doe Decl.") ¶¶ 5–6; Declaration of M. Doe ("M. Doe Decl.") ¶ 6. Shortly thereafter, furloughed employees lost access to their government e-mail accounts. See, e.g., H. Doe Decl. ¶ 12; M. Doe Decl. ¶ 12.

On October 1, 2025—the first day of the shutdown—Chase Forrester, the Department's Deputy Chief of Staff for Operations, overrode the furloughed employees' custom out-of-office messages and implemented a new "standardized" auto-reply. Forrester Decl. ¶ 5. The message (the "Original Message") read:

> Thank you for contacting me. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. Due to the lapse in appropriations I am currently in furlough status. I will respond to emails once government functions resume.

Id. The Original Message also applied to e-mail accounts for employees on administrative leave. See, e.g., B. Doe Decl. ¶ 8; E. Doe Decl. ¶ 9. Neither set of employees received advance notice

3

of this change.  <u>See</u> Forrester Decl. ¶ 5 (noting that the Department "implemented [the Original Message] on a system-wide basis without involvement of furloughed employees").

By the time many Department employees noticed the new out-of-office message, they had already lost access to their e-mail accounts and couldn't change it back.  <u>See, e.g.,</u> Declaration of A. Doe ("A. Doe Decl.") ¶ 12; J. Doe Decl. ¶ 11; L. Doe Decl. ¶ 11.  But at least one Department employee saw the Original Message while they were still authorized to access their e-mail.  <u>See</u> Declaration of F. Doe ¶ 10.  The employee changed their out-of-office message "back to the original, nonpartisan, script."  <u>Id.</u>  But when the employee later sent a message from their personal e-mail to their government e-mail, they received the Original Message in return. <u>Id.</u>  Another Department employee was explicitly told by a supervisor to leave the Original Message "as-is."  M. Doe. Decl. ¶ 7.

AFGE—a labor organization representing Department employees affected by this change—filed this lawsuit on October 3, 2025.  <u>See, e.g.,</u> B. Doe Decl. ¶ 3; E. Doe Decl. ¶ 3; H. Doe Decl. ¶ 3.  It alleged that the "co-opting" of Department employees' e-mail accounts "to speak against their will on this matter of public concern" violated the employees' First Amendment rights.  Compl. ¶ 48.  The same day, AFGE sent a cease-and-desist letter to the Department of Justice, informing the government that it would move for a temporary restraining order if the Department did not cease its unlawful behavior.  On October 6, 2025—in response to AFGE's letter—the Department implemented a revised auto-reply for furloughed employees. Forrester Decl. ¶ 6.  The message (the "Revised Message") reads:

> The Department employee you have contacted is currently in furlough status. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. The employee you have contacted will respond to emails once government functions resume.

<u>Id.</u>  The Revised Message is "currently in use."  <u>Id.</u>

4

The following day, AFGE moved for summary judgment and requested an expedited briefing schedule.  The Court agreed that expedited briefing was appropriate, but it allowed the government to file a cross-motion for summary judgment.  The parties' briefing is now complete, and the Court heard oral argument on the motions on November 4, 2025.

## II.    Legal Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When evaluating cross-motions for summary judgment, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  N.S. ex rel. Stein v. District of Columbia, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (citing Anderson, 477 U.S. at 247).  But in this case, the parties "present no genuine disputes of material facts precluding summary judgment."  Barr Lab'ys, Inc. v. Thompson, 238 F. Supp. 2d 236, 244 (D.D.C. 2002).  Thus, the Court may resolve the cross-motions for summary judgment "as a question of law."  Cartwright v. District of Columbia, 267 F. Supp. 2d 83, 85 (D.D.C. 2003) (citing Carl v. Udall, 309 F.2d 653, 658 (D.C. Cir. 1962)).

## III.    Analysis

Since the first day of the shutdown, the Department has used its employees' e-mail accounts to repeatedly deliver partisan messages that many employees do not wish to convey.  See, e.g., A. Doe Decl. ¶ 8; B. Doe Decl. ¶ 9; C. Doe Decl. ¶ 9.  AFGE contends that by commandeering its employees' e-mails in this manner, the Department is compelling their

speech in violation of the First Amendment.  The government responds by challenging both this Court's jurisdiction and the merits of AFGE's claim.  As to jurisdiction, the government asserts that Congress provided an exclusive path for administrative and judicial review of federal labor-related disputes, and that any claim regarding the Original Message is prudentially moot.  As to the merits, the government submits that the out-of-office messages are government, not personal, speech and are otherwise within the employees' official duties, thus placing them beyond the First Amendment's scope.

Having carefully considered the parties' positions, the Court concludes that (1) under the unusual—if not unique—circumstances of this case, the Court has jurisdiction over AFGE's claim; (2) AFGE's claim regarding the Original Message is prudentially moot; (3) the Revised Message unconstitutionally compels the Department employees' speech; and (4) AFGE is entitled to permanent injunctive relief.

A.  Administrative Channeling

The government first argues that the Court cannot reach the merits of the case because Congress precluded district court jurisdiction entirely.  In its view, AFGE's claim is a federal labor dispute that must proceed through administrative channels provided by the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSLMRS") before reaching an Article III court.  The Court disagrees.

1.  Origin and Structure of the CSRA and FSLMRS

Prior to the CSRA, a "patchwork of statutes and rules" formed "haphazard arrangements for administrative and judicial review of [agency] personnel action."  United States v. Fausto, 484 U.S. 439, 444 (1988) (citation omitted).  By passing the CSRA, Congress sought to "replace[] th[is] patchwork system with an integrated scheme of administrative and judicial

review." Id. at 445; see also Lindahl v. OPM, 470 U.S. 768, 773 (1985) (noting that the CSRA "comprehensively overhauled the civil service system"). The CSRA now "protects covered federal employees against a broad range of personnel practices, and it supplies a variety of causes of action and remedies to employees when their rights under the statute are violated." Grosdidier v. Chairman, Broad. Bd. of Governors, 560 F.3d 495, 497 (D.C. Cir. 2009).

Critically, the CSRA "prescribes in great detail the protections and remedies applicable to" personnel actions against federal employees, "including the availability of administrative and judicial review." Fausto, 484 U.S. at 443. The type of personnel action at issue dictates what protections are available. For example, an employee subjected to a "prohibited personnel practice" by an agency must file a complaint with the Office of Special Counsel ("OSC"). If the OSC determines that "there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken," it must report the charge to both the agency and the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 1214(b)(2)(B). If the agency does not correct the prohibited personnel practice, the OSC may petition the MSPB to take corrective action. Id. § 1214(b)(2)(C). If the employee is dissatisfied with the MSPB's decision, the employee may seek judicial review in the United States Court of Appeals for the Federal Circuit. Id. §§ 1214(c)(1), 7703(b); Elgin v. Dep't of Treasury, 567 U.S. 1, 6 (2012). Through this "integrated scheme" of review, Fausto, 484 U.S. at 445, Congress "intentionally provid[ed]—and intentionally [chose] not [to] provid[e]—particular forums and procedures for particular kinds of claims," Am. Fed'n of Gov't Emps. v. Sec'y of Air Force (Air Force), 716 F.3d 633, 636 (D.C. Cir. 2013) (alterations in original) (citation omitted). For that reason, "[t]he CSRA provides 'the exclusive avenue for suit' to a plaintiff whose claims fall within its scope." Id. (quoting Grosdidier, 560 F.3d at 497).

Title VII of the CSRA—also known as the FSLMRS—governs labor relations between the executive branch and its employees.  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE), 929 F.3d 748, 752 (D.C. Cir. 2019).  The FSLMRS "spells out various unfair labor practices," Air Force, 716 F.3d at 636 (citing 5 U.S.C. § 7116), and "defines the duty to bargain between federal management and unions," id. (citing 5 U.S.C. § 7117).  The statute also created the Federal Labor Relations Authority ("FLRA"), a three-member agency tasked with "adjudicating . . . 'unfair labor practice' disputes."  AFGE, 929 F.3d at 752 (citing 5 U.S.C. § 7105(a)); see ATF v. FLRA, 464 U.S. 89, 92 (1983).  When resolving unfair labor practice disputes, the FLRA determines "whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with" the FSLMRS.  AFGE, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118).  FLRA decisions are subject to direct review by the courts of appeals.  Id. (citing 5 U.S.C. § 7123(a), (c)).  Like the CSRA, the FSLMRS provides the exclusive scheme for asserting federal labor-management relations claims.  Nat'l Treasury Emps. Union v. Trump (NTEU), 770 F. Supp. 3d 1, 7 (D.D.C. 2025) (Cooper, J.) (citing AFGE, 929 F.3d at 755).

### 2. *Whether the CSRA or FSLMRS Deprive the Court of Jurisdiction*

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."  Bowles v. Russell, 551 U.S. 205, 212 (2007).  Ordinarily, district courts have jurisdiction over challenges to federal agency action.  See 28 U.S.C. § 1331.  But Congress may "preclude district courts from exercising jurisdiction over challenges to federal agency action" by creating an alternative "special statutory review scheme."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023).  Both the CSRA and the FSLMRS create alternative review schemes; the remaining question is whether they strip the Court of jurisdiction in this case.

To answer that question, the Court must turn to the two-step framework established by Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994). At the first step, the Court asks whether Congress's intent to preclude district court jurisdiction is "fairly discernible in the statutory scheme." Thunder Basin, 510 U.S. at 207 (quoting Block v. Cmty. Nutrition Inst., 467 U.S. 340, 351 (1984)). At the second step, the Court asks whether AFGE's claim is "of the type Congress intended to be reviewed within this statutory structure." Id. at 212. In other words, if (1) Congress intended for the CSRA and FSLMRS's alternative review schemes to preclude district court review, and (2) the alleged First Amendment violation falls within those schemes, then the Court lacks jurisdiction over AFGE's claim.

Resolution of Thunder Basin's first step here is straightforward: Congress clearly intended to preclude district court jurisdiction over claims that fall within the CSRA or FSLMRS's review schemes. See, e.g., Elgin, 567 U.S. at 11–12 ("Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court."); AFGE, 929 F.3d at 755 ("[W]e can fairly discern that Congress intended the [FSLMRS's] statutory scheme to be exclusive with respect to claims within its scope."); Air Force, 716 F.3d at 636; NTEU, 770 F. Supp. 3d at 8.

So the Court must turn its focus to Thunder Basin's second step. See Axon, 598 U.S. at 185 (noting that a statutory review scheme which ordinarily precludes district court jurisdiction "does not necessarily extend to every claim concerning agency action"). Three considerations— commonly known as the Thunder Basin factors—guide the Court's analysis. Id. at 186. First, would "precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim"? Id. (quoting Thunder Basin, 510 U.S. at 212–13). Second, "is the claim 'wholly

collateral to [the] statute's review provisions'"?  Id. (alteration in original) (quoting Thunder Basin, 510 U.S. at 212).  Third, "is the claim 'outside of the agency's expertise'"?  Id. (quoting Thunder Basin, 510 U.S. at 212).

"When the answer to all three questions is yes," the Court must "presume that Congress does not intend to limit jurisdiction" to the alternative review scheme.  Id. (citation omitted).  However, "the same conclusion might follow if the factors point in different directions."  Id.  The factors are intended to answer "[t]he ultimate question" of "whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."  Id.; see also Jarkesy v. SEC, 803 F.3d 9, 17 (D.C. Cir. 2015) (describing the Thunder Basin factors as "general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design").

a.  Meaningful Judicial Review

The first Thunder Basin factor examines whether "a finding of preclusion could foreclose all meaningful judicial review."  510 U.S. at 212–13.  Judicial review can be "meaningful" even if the district court is not involved; a court of appeals' review of an agency action is typically sufficient.  Axon, 598 U.S. at 190.  For example, the CSRA allows for "meaningful review" of constitutional claims brought by "covered employees challenging a covered adverse employment action" because the Federal Circuit would have jurisdiction over the employees' appeal.  Elgin, 567 U.S. at 21.  Similarly, the FSLMRS provides "meaningful" judicial review by permitting a court of appeals to review FLRA proceedings.  AFGE, 929 F.3d at 755, 759.  Citing this precedent, the government contends that AFGE could raise its First Amendment claim under both statutory schemes.  Either way, the administrative channels would allow for judicial review by an Article III court.  See 5 U.S.C. §§ 1214(c)(1), 7123(a), (c).

However, the first <u>Thunder Basin</u> factor turns not only on *whether* the plaintiff's claim would receive judicial review, but also *when* that review would occur. <u>Axon</u> is illustrative. In that case, the plaintiffs were subject to enforcement actions by the SEC and the FTC. 598 U.S. at 182–83. Before their administrative hearings began, the plaintiffs filed lawsuits to enjoin the agencies from "subjecting" them to proceedings overseen by an administrative law judge ("ALJ") who was unconstitutionally shielded from removal by the President. <u>Id.</u> Evaluating the first <u>Thunder Basin</u> factor, the Court noted that if the plaintiffs were obliged to follow the statutory review scheme, then they could not seek appellate review of their constitutional claims until the agency proceedings were over. <u>Id.</u> at 191. By that point, the alleged constitutional injury—being subjected to an illegitimate proceeding before an ALJ—would have already occurred. <u>Id.</u> Because "[a] proceeding that has already happened cannot be undone," judicial review of the plaintiffs' constitutional claims would "come too late to be meaningful." <u>Id.</u>

Similar logic applies here. Due to the lapse in appropriations, the administrative agencies tasked with adjudicating federal employee disputes under the CSRA and the FSLMRS—including the OSC, the MSPB, and the FLRA—are closed. There is no evidence that these agencies will reopen before the shutdown concludes. So if AFGE had to proceed through these prescribed administrative channels, then by the time it could seek judicial review, the shutdown would necessarily be over. By that point, the Revised Message would no longer be in effect, and there would be no way to afford AFGE meaningful relief. Put another way, the Department employees would "lose their rights not to" speak against their will "if they cannot assert those rights until the [agency] proceedings are over." <u>Id.</u> at 192.

The government contends that this reasoning conflicts with <u>Air Force</u> and <u>Grosdidier</u>. In those cases, the government notes, the D.C. Circuit required government employees to proceed

through the CSRA administrative review scheme even if it occasionally closes the courthouse doors to would-be plaintiffs.  See Air Force, 716 F.3d at 638 ("[A]s we have explained, 'it is the comprehensiveness of the statutory scheme involved, not the "adequacy" of specific remedies thereunder, that counsels judicial abstention.'" (citation omitted)); Grosdidier, 560 F.3d at 497 ("Congress designed the CSRA's remedial scheme with care, 'intentionally providing—and intentionally not providing—particular forums and procedures for particular kinds of claims.'" (citation omitted)).

But even assuming the government's reading is correct, those cases—and every other case cited by the government—did not involve a *constitutional* claim that is, in effect, *entirely* unreviewable by an Article III court because the administrative channels were not operating. See, e.g., AFGE, 929 F.3d at 759 ("[W]e see no reason to think that the [plaintiffs'] claims would be 'unreviewable' by an appellate court through the statutory scheme." (citation omitted)). In Thunder Basin, for example, the Supreme Court found that the plaintiff's constitutional claims could be "meaningfully addressed" by a court of appeals after the agency proceedings.  510 U.S. at 215 (citation omitted).  It warned, however, that a "serious constitutional question" would arise "if an agency statute were construed to preclude *all* judicial review of a constitutional claim."  Id. at 215 n.20 (emphasis added) (citing Bowen v. Mich. Acad. of Fam. Physicians, 476 U.S. 667, 681 n.12 (1986)).  In line with that reasoning, "some judges in this District have held that the CSRA does not preclude judicial review of constitutional claims where application of the CSRA would 'deny *any* judicial forum for a colorable constitutional claim.'"  Tarquinii v. Del Toro, No. 21-cv-1567 (RC), 2024 WL 4298857, at *22 (D.D.C. Sep. 26, 2024) (emphasis added) (citation omitted) (collecting cases).

The first <u>Thunder Basin</u> factor thus weighs heavily in favor of allowing the Court to review AFGE's claim.  Like the plaintiffs in <u>Axon</u>, the Department employees' injury "is impossible to remedy once the [administrative] proceeding is over."  598 U.S. at 191; <u>see</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  By the time the MSPB or FLRA reopened and rendered a decision reviewable by the Federal Circuit or another court of appeals, the alleged constitutional injury—the Department employees' compelled speech— would be over.  Judicial review "would come too late to be meaningful."  <u>Axon</u>, 598 U.S. at 191.

### b.  <u>"Wholly Collateral" to the Statutory Review Scheme</u>

The second <u>Thunder Basin</u> factor considers whether AFGE's claim is "wholly collateral" to the statutory review scheme.  510 U.S. at 212 (citation and internal quotation marks omitted). "A challenge is not 'wholly collateral' to a statutory scheme if the plaintiff 'aim[s] to obtain the same relief [it] could seek' through the statutory regime, especially where the claims are 'inextricably intertwined with the conduct of the' statutory scheme's proceedings."  <u>Fed. L. Enf't Officers Ass'n v. Ahuja</u>, 62 F.4th 551, 561 (D.C. Cir. 2023) (alterations in original) (quoting <u>Jarkesy</u>, 803 F.3d at 23).

Here, the parties dispute whether changing employees' out-of-office messages without consent is "the type of personnel action regularly adjudicated" within the CSRA or FSLMRS schemes.  <u>Elgin</u>, 567 U.S. at 22 (noting that a claim is not "wholly collateral" to the CSRA review scheme if it challenges a "CSRA-covered employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords").  According to the government, AFGE's claim qualifies as either (1) a "grievance" under the FSLMRS, subject to the arbitration

process provided by AFGE's collective bargaining agreement, or (2) a "prohibited personnel practice" under the CSRA, subject to review by the OSC and MSPB.

First, the FSLMRS defines a "grievance" as any complaint brought by a labor organization concerning "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9)(C)(ii). In general, "conditions of employment" include "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." Id. § 7103(a)(14). The FSLMRS provides that every collective bargaining agreement between the government and a labor organization must include "procedures for the settlement of grievances, including questions of arbitrability." Id. § 7121(a)(1); see Air Force, 716 F.3d at 636–37 ("[A]n aggrieved party may resort to a grievance resolution and arbitration procedure that the FSLMRS requires be included in every collective bargaining agreement."). After arbitration, a party may file an exception to an arbitrator's award with the FLRA. See 5 U.S.C. § 7122(a); Air Force, 716 F.3d at 637.

Second, the CSRA enumerates several "prohibited personnel practices" that must be brought before the OSC. The government identifies only one as relevant to this case:

> Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority . . . coerce the political activity of any person (including the providing of any political contribution or service), or take any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity[.]

5 U.S.C. § 2302(b)(3). A "personnel action" includes appointments, promotions, disciplinary actions, or "any other significant change in duties, responsibilities, or working conditions." Id. § 2302(a)(2)(A).

Boiled down, AFGE's First Amendment claim is a "grievance" if it challenges "personnel policies, practices, [or] matters" affecting "working conditions," and it challenges a "prohibited personnel practice" if the Department took an action "with respect to" any "significant change in . . . working conditions."  Whether AFGE's claim is "wholly collateral" thus turns on the extent to which the Department's actions affected its employees' "working conditions."

Neither the FSLMRS nor the CSRA defines "working conditions."  The Supreme Court has indicated that under the FSLMRS, "working conditions" refers "only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job."  Fort Stewart Schs. v. FLRA, 495 U.S. 641, 645 (1990); see also Dep't of Def. Dependents Schs. v. FLRA, 863 F.2d 988, 990 (D.C. Cir. 1988) ("The term 'working conditions' ordinarily calls to mind the day-to-day circumstances under which an employee performs his or her job."), judgment vacated on reh'g, 911 F.2d 743 (D.C. Cir. 1990).  That is, "the term 'working conditions' generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources."  Turner v. U.S. Agency for Glob. Media, 502 F. Supp. 3d 333, 367 (D.D.C. 2020) (interpreting the term "working conditions" under the CSRA).

It is not clear whether the widespread injection of unwanted partisan statements in Department employees' out-of-office messages constitutes a change in "working conditions."  On the one hand, the messages don't quite fit with typical examples of working conditions, such as hours or job assignments, and the Department employees on administrative leave or furlough are not even "working" while the out-of-office messages are in effect.  On the other, several employees expressed concern that the out-of-office messages would affect the performance of

their duties upon their return.  See, e.g., C. Doe Decl. ¶ 12 ("I fear that [the Original Message]

will damage professional relationships that have taken years to build."); M. Doe Decl. ¶ 13

("[The Department's Office of Civil Rights] holds itself out to the public as, and verbatim

represents itself to be, a 'neutral fact finder.' I believe that publicly making explicitly partisan

statements, such as the one in the [Original Message], undermines that capacity.").  Neither party

meaningfully addresses this ambiguity.  On the current record, then, the Court cannot find that

the second Thunder Basin factor weighs strongly in either direction.

### c.  Outside of the Agency's Expertise

The final Thunder Basin factor asks whether AFGE's claim is "outside the agenc[ies']

expertise."  510 U.S. at 212.  The Court must consider whether the agencies have "extensive

experience" on the issue or whether "technical considerations of [agency] policy" are required.

Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 491 (2010) (citations omitted).

To answer this question, AFGE directs the Court to Axon.  There, the Supreme Court

concluded that one of the constitutional claims raised by the plaintiffs—whether the ALJs were

too far insulated from the President's supervision—presented "'standard questions of

administrative' and constitutional law, detached from 'considerations of agency policy.'"  598

U.S. at 194 (quoting Free Enter. Fund, 561 U.S. at 491).  For another claim involving the FTC's

dual prosecutorial and adjudicative functions, the Court found that while the FTC knew "a good

deal about competition policy," it knew "nothing special about the separation of powers."  Id.

AFGE analogizes that the FLRA, OSC, and MSPB know "a good deal about" federal labor and

employment law, but "nothing special" about compelled speech.

The government disagrees, noting that the FLRA and MPSB hear First Amendment

claims all the time.  As the Supreme Court recognized in Elgin, "the MSPB routinely adjudicates

some constitutional claims, such as claims that an agency took adverse employment action in violation of an employee's First [] Amendment rights, and . . . these claims must be brought within the CSRA scheme."  567 U.S. at 12.

If AFGE's claim fell squarely within the FSLMRS or CSRA's review schemes, then it would not be beyond the agencies' expertise.  See Axon, 598 U.S. at 195 (suggesting that agencies can address constitutional questions that are "intertwined with or embedded in matters on which the [agencies] are expert").  But as described above, it is not clear whether altering employees' out-of-office messages amounts to a "grievance" under the FSLMRS or a "prohibited personnel practice" under the CSRA.  In other words, it is "less certain" that AFGE's compelled-speech claim "lie[s] at the core" of the agencies' "specialized expertise in the field of federal labor relations."  NTEU, 770 F. Supp. 3d at 10 (internal quotation marks omitted) (quoting AFGE, 929 F.3d at 760).  Still, the claim does "not appear that far afield from the agenc[ies'] usual review."  Id. at 11.  Thus, the third Thunder Basin factor also does not weigh strongly in favor or against the Court's exercise of jurisdiction.  See Axon, 598 U.S. at 195 (noting that the plaintiffs' injury "would remain no matter how much expertise could be 'brought to bear' on the other issues" involved in the cases (quoting Thunder Basin, 510 U.S. at 215)).

* * *

"Congress rarely allows claims about agency action to escape *effective* judicial review." Id. at 186 (emphasis added); see also Bowen, 476 U.S. at 670 (recognizing a "strong presumption that Congress intends judicial review of administrative action").  Under normal circumstances, the CSRA and FSLMRS may have provided "meaningful judicial review" of AFGE's First Amendment claim after the prescribed agency review process.  See AFGE, 929 F.3d at 755.  But those administrative channels are now closed.  They will remain entirely

unavailable until the end of the shutdown, by which point the alleged First Amendment injury will be complete. Thus, any judicial relief derived from the administrative review scheme "would come too late to be meaningful." Axon, 598 F.4th at 191. Because the remaining Thunder Basin factors do not override that conclusion, AFGE is not required to pass through the relevant administrative review channels before coming to federal court. See Lucas v. Am. Fed'n of Gov't Emps., 151 F.4th 370, 387 (D.C. Cir. 2025) (describing the first Thunder Basin factor as "all but dispositive" when the plaintiff would "have no meaningful opportunity for judicial review" unless they could proceed in federal court).

B. Mootness

It is undisputed that the Department replaced the Original Message with the Revised Message on October 6, 2025. The Department has further committed "to not reverting to the Original Message during the pendency of the government shutdown," and it "intends to leave in place the [Revised] Message." Forrester Decl. ¶ 7. These assurances raise the question of whether the Court should still address the constitutionality of the Original Message.

According to the government, any claim about the Original Message is prudentially moot.[1] Prudential mootness is the "cousin" of constitutional mootness. Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980) (describing prudential mootness as "a mélange of doctrines relating to the court's discretion in matters of remedy and judicial administration"). While constitutional mootness refers to the "power" to grant relief, prudential mootness refers to "the court's discretion in the exercise of that power." Id. The court may deem a case to be prudentially moot when "a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government

---

[1] The government does not argue that AFGE's claim is constitutionally moot.

counsel the court to stay its hand, and to withhold relief it has the power to grant." Id.  For

example, a case may be prudentially moot when there is no "cognizable danger of recurrent

violation, something more than the mere possibility which serves to keep the case alive." Cmty.

for Creative Non-Violence v. Hess, 745 F.2d 697, 700 (D.C. Cir. 1984) (citation omitted); see

also id. at 701 (declining to reach the merits of a claim because "the likelihood of recurrent

confrontations" between the parties "is much too small to warrant decision of the issue").

    As an equitable doctrine, prudential mootness "cannot be cabined by inflexible,

formalistic rules, but instead require[s] a case-by-case judgment regarding[] the feasibility or

futility of effective relief should a litigant prevail." In re AOV Indus., Inc., 792 F.2d 1140,

1147–48 (D.C. Cir. 1986).  Still, courts have considered several factors when determining

whether there is a "cognizable danger of recurrent violation." Hess, 745 F.2d at 700.  The D.C.

Circuit has instructed courts to "take into account 'the bona fides of the expressed intent to

comply, the effectiveness of the discontinuance and, in some cases, the character of the past

violations.'" Id. at 700–01 (citation omitted).  The doctrine may also apply "where the court can

avoid the premature adjudication of constitutional issues," Penthouse Int'l, Ltd. v. Meese, 939

F.2d 1011, 1020 (D.C. Cir. 1991), or where "the challenged practice had been withdrawn or was

undergoing substantial revision, so that the reviewing court could not be certain of the

regulation's ultimate form," Reeve Aleutian Airways, Inc. v. United States, 889 F.2d 1139, 1144

(D.C. Cir. 1989).

    Because the Department commits to not reimplementing the Original Message during the

shutdown, the Court need not decide its constitutionality.  The Court credits the Department

official's assurances, see Forrester Decl. ¶ 7, and AFGE has not provided any evidence that the

Department would renege on its promise.  In the absence of a "cognizable danger" that the Original Message would recur, Hess, 745 F.2d at 700, the Court will stay its hand.[2]

However, the parties agree that the Revised Message continues to present a live controversy.  And while the shutdown may be temporary, the Court adheres to the "ordinary rule" that it "need not 'dismiss a live controversy as moot merely because it may become moot in the near future.'"  Conservation L. Found. v. Pritzker, 37 F. Supp. 3d 254, 265 (D.D.C. 2014) (citation omitted).  Because the Court may still offer "meaningful relief" for the remainder of the shutdown, it marches onward to the merits.[3]  Id.

C.  AFGE's First Amendment Claim

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).  The freedom of thought, enshrined in the First Amendment, encompasses "both the right to speak freely and the right to refrain from speaking at all."  Wooley v. Maynard, 430 U.S. 705, 714 (1977).  And when the government compels

---

[2] That being said, the Department's prompt recission of the Original Message after the Department of Justice received AFGE's cease-and-desist letter is likely indicative of the message's unconstitutionality.

[3] The government contends that the Court may not grant summary judgment to AFGE based solely on the Revised Message because that message—which the Department implemented in response to this lawsuit—is not mentioned in the complaint.  See, e.g., District of Columbia v. Barrie, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing.").  But by seeking summary judgment based on the Revised Message, AFGE is neither bringing a new claim nor presenting a new theory of relief.  Rather, AFGE merely contends that the Revised Message—like the Original Message that preceded it—compels the Department employees' speech.  Moreover, the government has not explained how it was prejudiced by the omission of the Revised Message from the complaint, especially when there are no facts in dispute and the government addressed both messages in its briefing.

individuals "to mouth support for views they find objectionable," it deprives them of that fundamental right.  Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. 878, 892 (2018).

In this case, it is undisputed that the Department implemented the Revised Message without its employees' consent.  It is undisputed that the Revised Message is automatically sent from Department employees' e-mail accounts in response to incoming messages.  And it is undisputed that the Revised Message blames "Democrat Senators" for causing the lapse in appropriations by "blocking passage" of "a clean continuing resolution."  Some Department employees do not share that view, and therefore believe that they are being "coerced into betraying their convictions."  Id. at 893; see, e.g., A. Doe Decl. ¶ 10 ("I do not wish to share the views expressed in [the Revised Message].  I would not have written this automatic message if I had access to my account because I believe it is a partisan message.").

The government sees things differently.  It claims that the Revised Message is not compelling the speech of its employees, but rather conveying its *own* speech.  And even if the speech is attributable to the Department's employees, says the government, sending out-of-office messages is within the scope of their official duties, so the Department can require that they deliver the message.  See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  The government thus submits that the Revised Message is not protected by the First Amendment, so AFGE's claim necessarily fails.

This case sits at the seldom-traversed intersection of two First Amendment doctrines: the prohibition on compelled speech and the free speech rights of public employees.  While the Supreme Court has provided some helpful guideposts, the unprecedented circumstances of this case require the Court to chart its own path forward.  But for all its novelty, this case does not

lack for clarity. When government employees enter public service, they do not sign away their First Amendment rights, and they certainly do not sign up to be a billboard for any given administration's partisan views.

### 1. Compelled Speech

AFGE contends that by implementing the Revised Message, the Department is forcing its employees to speak on a political issue against their will. This claim rests on a simple but crucial premise: Someone perceiving the speech—that is, a person receiving the Revised Message—would attribute the speech to the employee. If that premise holds true, then the Department would be engaging in the "outright compulsion of speech." Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 557 (2005). If not, the Department employees would not be "compelled to *affirm their belief* in any governmentally prescribed position or view." PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 88 (1980) (emphasis added).[4]

As the government correctly notes, the Revised Message—unlike its predecessor—is phrased in the third person:

> *The Department employee you have contacted* is currently in furlough status. On September 19, 2025, the House of Representatives passed H.R. 5371, a clean continuing resolution. Unfortunately, Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations. *The employee you have contacted* will respond to emails once government functions resume.

---

[4] A brief example drawn from AFGE's complaint illustrates why "attribution" is a necessary predicate to its compelled-speech claim. Consider a government IT employee tasked with adding an electronic banner at the top of an agency's official website. See, e.g., Compl. ¶¶ 17–23. The banner describes the lapse in appropriations as a "Democrat-led shutdown," id. ¶ 19, or a "Radical Left Democrat shutdown," id. ¶ 20. While the employee who created the banner may disagree with the message, it is doubtful that the employee would have a viable compelled-speech claim. After all, there is little risk that a person visiting the website would attribute the banner's speech to the employee who altered the website's code.

Forrester Decl. ¶ 6 (emphasis added).  For that reason, the government downplays the risk that the message would be attributed to a particular employee rather than the Department itself. AFGE retorts that regardless of the tense used, out-of-office messages are naturally associated with their sender, and recipients of the Revised Message would see a specific employee's name and e-mail address alongside the message itself.  As one furloughed employee puts it, the Revised Message "force[s]" Department employees "to *appear* partisan."  A. Doe Decl. ¶ 11 (emphasis added).

Whether the Revised Message is attributable to the Department employees depends on the level of association that exists between the speech and the speaker.  In Barnette, for example, the Supreme Court held that a rule requiring public school students to recite the Pledge of Allegiance violated the First Amendment because "[i]t require[d] the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks."  319 U.S. at 633.  In Wooley, the Court concluded that a New Hampshire law requiring license plates to display the state motto "Live Free or Die" amounted to compelled speech because it "force[d] an individual, as part of his daily life indeed constantly while his automobile is in public view to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." 430 U.S. at 715.  And in Johanns, the Court acknowledged that beef producers might have a "valid" First Amendment challenge to a federal program requiring them to fund certain promotional messages if the producers were "closely linked with the expression in a way that makes them appear to endorse the government message."  544 U.S. at 565 n.8 (citation and internal quotation marks omitted)); see also id. at 568 (Thomas, J., concurring) ("The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them[.]").

Here too, the speakers (*i.e.*, the Department employees) and the speech (*i.e.*, the Revised Message) are "closely linked."  Id. at 565 n.8 (majority opinion).  The out-of-office message— which automatically responds to incoming e-mails—includes the employees' names and e-mail addresses.  See A. Doe Decl. ¶¶ 6–7.  A person receiving the Revised Message might reasonably believe that the named employee authored the message, or at least endorsed the message by declining to change it.  After all, common experience teaches that individual employees typically draft their own out-of-office responses and are not forced to include specific language dictated by their employers.  Moreover, the employee did not have an opportunity to disavow the message or otherwise clarify their personal views because they cannot access their government e-mail account.  This combination of factors presents an "unacceptable risk" that the Revised Message would be viewed as the employee's speech.  Nat'l Ass'n of Mfrs. v. Perez, 103 F. Supp. 3d 7, 16 (D.D.C. 2015); see, e.g., Declaration of O. Doe ¶ 9 ("This compelled speech misrepresents my views and associates me with government speech that conflicts with my personal beliefs and views as well as my professional obligations to neutrality.").  The third-person phrasing of the response does not eliminate the risk.  See Clarke v. United States, 886 F.2d 404, 413 n.7 (D.C. Cir. 1989) (noting that the laws in Barnette and Wooley were invalid "not simply because onlookers might mistakenly have concluded that those involuntarily compelled to assert the challenged messages agreed with them, but also because an individual has a right not to be made an 'instrument [of] . . . an ideological point of view he finds unacceptable'" (alterations in original) (citation omitted)), vacated as moot, 915 F.2d 699 (D.C. Cir. 1990).  So much like a motto on a license plate, the Department is forcing its employees "to be an instrument for fostering public adherence to an ideological point of view" through their e-

mail accounts.  <u>Wooley</u>, 430 U.S. at 715.  By doing so, the Department has created an

unacceptable risk that the Revised Message will be attributed to individual employees.

### 2. *Public Employees' First Amendment Rights*

The government next contends that, even if the Revised Message compels the

Department employees' speech, there is still no First Amendment violation.  That's because, as

an employer, the Department "may insist that [its] employee[s] deliver any lawful message."

<u>Janus</u>, 585 U.S. at 908.

It is well-established that "public employees do not renounce their citizenship when they

accept employment, and . . . public employers may not condition employment on the

relinquishment of constitutional rights."  <u>Lane v. Franks</u>, 573 U.S. 228, 236 (2014).  It is equally

true that "[g]overnment employers, like private employers, need a significant degree of control

over their employees' words and actions; without it, there would be little chance for the efficient

provision of public services."  <u>Garcetti</u>, 547 U.S. at 418.  The problem—frequently encountered

by courts—is finding the appropriate balance between these competing interests.  <u>See</u> <u>Pickering</u>

<u>v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.</u>, 391 U.S. 563, 568 (1968).

"To account for the complexity associated with the interplay between free speech rights

and government employment," <u>Kennedy v. Bremerton Sch. Dist.</u>, 597 U.S. 507, 527 (2022),

<u>Pickering</u> and its progeny instruct courts to proceed in two steps:

> The first requires determining whether the employee spoke as a citizen on a matter
> of public concern. If the answer is no, the employee has no First Amendment cause
> of action based on his or her employer's reaction to the speech. If the answer is yes,
> then the possibility of a First Amendment claim arises. The question becomes
> whether the relevant government entity had an adequate justification for treating
> the employee differently from any other member of the general public.

<u>Garcetti</u>, 547 U.S. at 418 (citations omitted).  In other words, the first step examines whether the

employee was speaking as a citizen on a matter of public concern, and the second step balances

the employee's speech interests against the government's operational interests.  See Mpoy v. Rhee, 758 F.3d 285, 290 (D.C. Cir. 2014).[5]

### a.   Whether Pickering Applies to Compelled Speech Claims

Before applying Pickering's two-step framework to this case, the Court must consider whether it should apply at all, or at least be tweaked in light of the particular facts at hand.  As both parties concede, Pickering may be a "poor fit" for AFGE's compelled-speech claim.  Janus, 585 U.S. at 909.

In Janus, the Supreme Court held that a state law authorizing public-sector unions to collect fees from nonconsenting employees violates the First Amendment.  Id. at 929–30.  In reaching that decision, the Court opined in dicta on the limitations of Pickering and its progeny. Specifically, the Court suggested that "the Pickering framework fits much less well where the government compels speech or speech subsidies in support of third parties."  Id. at 908.  The Court noted that Pickering's balancing test "is based on the insight that the speech of a public-sector employee may interfere with the effective operation of a government office."  Id.  To be sure, the employer "may insist that [an] employee deliver any lawful message" if the speech "is

---

[5] In its cross-motion for summary judgment, the government encouraged the Court to apply the three-factor test for evaluating "government speech" under Pleasant Grove City v. Summum, 555 U.S. 460 (2009), and Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015).  While this case may involve a form of "government speech," the question here is not whether the government is "speaking on its own behalf or . . . providing a forum for private speech."  Summum, 555 U.S. at 470.  Nor is it whether the Department engaged in viewpoint discrimination by promulgating the Revised Message while prohibiting other partisan out-of-office messages.  See Walker, 576 U.S. at 208.  Instead, AFGE contends that by implementing the Revised Message, the Department is compelling the speech of its employees. See Compl. ¶ 48.  This claim is more appropriately assessed under the Pickering framework.  See Baumann v. District of Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015) ("Pickering and its progeny continue to be the meter by which the First Amendment rights of public employees are measured." (citation omitted)).  In its reply brief and at oral argument, the government abandoned its reliance on the three-factor Summum and Walker test.

part of [the] employee's official duties." Id. (citing Garcetti, 547 U.S. at 421–22, 425–26). But if the speech is outside of the employee's official duties, the Court found it difficult "to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." Id. (acknowledging that the Court had never applied Pickering to such a case). The Court did not decide whether Pickering "applies at all" to a compelled speech claim, but it indicated that the test "would certainly require adjustment in that context." Id.

In the wake of Janus, lower courts have hesitated to accept the Supreme Court's invitation to modify the Pickering test for compelled-speech claims. See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs., 680 F. Supp. 3d 1250, 1286–87 (D. Wyo. 2023) (collecting cases) ("While Janus certainly left open the possibility that Pickering may not apply to cases where the government compelled the speech of its employees, the clear majority of courts to address the issue have concluded Pickering still applies to such claims."). For example, the Sixth Circuit applied Pickering's balancing test to a professor's claim that a university compelled his speech by requiring him to use students' preferred pronouns. Meriwether v. Hartop, 992 F.3d 492, 509–11 (6th Cir. 2021). In weighing the professor's interest in expressing his religious and philosophical beliefs, the court described the "compelled" nature of the speech to be "an additional element" in his favor. Id. at 509–10.

Absent clear instructions from the Supreme Court or the D.C. Circuit, the Court will follow suit and apply the traditional Pickering framework, which is "more lenient" to the government than strict scrutiny. Kennedy, 597 U.S. at 532. Either way, the outcome is the same: The Department does not have a "legitimate need" to insert partisan speech in its employees' out-of-office messages. Janus, 585 U.S. at 908.

b.  Applying the *Pickering* Framework

The two-part Pickering balancing test weighs heavily in AFGE's favor.  At the threshold step, the speech in question addresses a matter of public concern—who bears responsibility for the government shutdown—that is well outside of the Department employees' job responsibilities.  At the balancing step, the employees' interest in not being compelled to speak far exceeds the government's interest in delivering a patently partisan message through its rank-and-file employees.

i.  *Speaking as a Citizen on a Matter of Public Concern*

In this case, the first step of the Pickering analysis comes down to a single question: whether the Revised Message was within the scope of the employees' official duties.[6]  That's because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."  Garcetti, 547 U.S. at 421.  If the government "commissioned or created" speech that "the employee was expected to deliver in the course of carrying out his job," then the employee's speech is a form of government speech unprotected by the First Amendment.  Kennedy, 597 U.S. at 529 (citing Garcetti, 547 U.S. at 422).  If, however, the relevant speech is not "ordinarily within the scope of [the] employee's duties," then it is not government speech.  Id. (citing Lane, 573 U.S. at 240).

The Supreme Court has provided guidance on how to distinguish government speech from speech as a private citizen.  In Garcetti, the Court held that a memorandum written by

---

[6] The government does not dispute that the Revised Message implicates a matter of public concern.  See Snyder v. Phelps, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" (citations omitted).  Who bears responsibility for the government shutdown surely fits the bill.

deputy district attorney to his supervisors was not protected by the First Amendment because it was "made pursuant to his duties" as a prosecutor.  547 U.S. at 421.  The Court contrasted employees "who make public statements outside the course of performing their official duties"—such as those who "discuss[] politics with a co-worker"—with employees who speak "pursuant to employment responsibilities."  Id. at 423–24.  While the former "retain some possibility of First Amendment protection," the latter do not.  Id. at 423.  The Court did not provide "a comprehensive framework for defining the scope of an employee's duties," but it suggested that employers could not "restrict employees' rights by creating excessively broad job descriptions."  Id. at 424.  Instead, "[t]he proper inquiry is a practical one."  Id.

The Court addressed a similar question in Lane, concluding that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties" was "speech as a citizen for First Amendment purposes."  573 U.S. at 238.  In that case, the relevant inquiry was not whether the employee's speech *related* to their role as a public employee; it was whether the speech *itself* was ordinarily within the scope of the employee's duties.  See id. at 240 ("The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

The Court recently returned to this issue in Kennedy, in which a high school football coach was placed on administrative leave after he routinely engaged in prayer at the 50-yard line after each game.  597 U.S. at 514–19.  The Court concluded that the coach's prayers were "private speech" because they were not "'ordinarily within the scope' of his duties as a coach," he "did not speak pursuant to government policy," and he "was not seeking to convey a government-created message."  Id. at 529 (citation omitted).  Because the prayers did not "ow[e

their] existence" to the coach's responsibilities as a public employee, they were not government speech. Id. at 530 (alteration in original) (quoting Garcetti, 547 U.S. at 421).

While both parties rely on this precedent, they apply different levels of generality to explain whether the Revised Message is within the scope of the Department employees' official duties. The government takes the broader vantage: Employees are responsible for setting out-of-office messages during the government shutdown, and the Revised Message falls within that duty. AFGE narrows the aperture: Employees are *not* responsible for stating a political opinion in their out-of-office message, so the Revised Message falls well outside the scope of their duties.

The Court adopts the latter perspective. When evaluating whether speech was "ordinarily within the scope" of an employee's duties, courts have considered the *content* of the speech, in addition to its medium and intended audience. See, e.g., id. at 529–30 (acknowledging that the football coach "was not seeking to convey a government-created message" and did not "engage[] in any other speech that [the school district] paid him to produce as coach"); Mpoy, 758 F.3d at 291 ("Both the content and the context of the [speech] indicate that [the employee] was speaking as an employee reporting conduct that interfered with his job responsibilities, rather than as a citizen."). Under the government's expansive theory, *any* statements contained in an employee's out-of-office message would fall within their official duties and be left unprotected by the First Amendment. This sweeping view of government speech is surely too broad. See Garcetti, 547 U.S. at 424 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions"); Kennedy, 597 U.S. at 530–31 (declining to treat "everything [government employees] say in the workplace as government speech subject to government control").

It is undisputed that commenting to the public on the politics underlying the government shutdown is not within the Department employees' job responsibilities. But by stating that "Democrat Senators are blocking passage of H.R. 5371 in the Senate which has led to a lapse in appropriations," the Revised Message conveys a blatantly partisan message. Because this message is "outside the course of performing their duties," the employees "retain some possibility of First Amendment protection." Garcetti, 547 U.S. at 423.

### ii. Balancing the Employees' and Employer's Interests

At the Pickering framework's second step, the Court must weigh the employees' interests as commenting (or, in this case, not commenting) on matters of public concern against the Department's interest in the efficient administration of government.[7] See Pickering, 391 U.S. at 568; Kennedy, 597 U.S. at 531 ("Under the Pickering–Garcetti framework, a second step remains where the government may seek to prove that its interests as employer outweigh even an employee's private speech on a matter of public concern.").

Start with the employees' interests. Free speech is "essential to our democratic form of government, and it furthers the search for truth." Janus, 585 U.S. at 893 (citations omitted). But when the government "compels [individuals] to voice ideas with which they disagree, it undermines these ends." Id. Compelled speech coerces individuals "into betraying their convictions," and "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." Id.

These concerns take on an added significance in the context of public employment. As noted at the outset, nonpartisanship is the foundation of the federal civil-service system.

---

[7] The government's briefing does not address the relevant interests under Pickering's balancing test; instead, it only argues that under Janus, compelled-speech claims do not fit within the Pickering framework at all. See 585 U.S. at 906.

Congress codified this principle almost 90 years ago in the Hatch Act, which sought to ensure that public employees "would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." U. S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 566 (1973); see also Connick v. Myers, 461 U.S. 138, 149 (1983) ("[T]here is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service.").  Just as private individuals have an interest in remaining free from coerced speech, government employees have a special "interest in being 'sufficiently free from improper influence' or coercion" in their workplaces.  Wagner v. FEC, 793 F.3d 1, 9 (D.C. Cir. 2015) (quoting Nat'l Ass'n of Letter Carriers, 413 U.S. at 564).

Now consider the other half of the ledger: the Department's interest in changing its employees' out-of-office messages to the Revised Message.  This side of the Pickering scale is "entirely empty." Lane, 573 U.S. at 242.  The government has failed to identify, let alone substantiate, any legitimate interest whatsoever in using its rank-and-file employees' e-mail accounts to promulgate partisan political statements.  If anything, the government should be concerned with *preventing* its employees from conveying political messages.  See Nat'l Ass'n of Letter Carriers, 413 U.S. at 564–65 ("It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party."); id. at 565 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.").

In short, "where the [government's] interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." Wooley, 430 U.S. at 717.  The Department's political appointees' interest in casting blame for the government shutdown on the rival political party is surely outweighed the employees' interest in maintaining neutrality during their public service.  Thus, the Pickering balance strongly favors AFGE.

\* \* \*

Over a month ago, the Executive Branch launched a multifront campaign to assign blame for the government shutdown.  It began by plastering politically-charged language on official public websites. See, e.g., Compl. ¶¶ 17 (Department of Housing and Urban Development:  "The Radical Left in Congress shut down the government."), 18 (Department of Justice:  "Democrats have shut down the government."), 19 (Department of State:  "Due to the Democrat-led shutdown, website updates will be limited until full operations resume."), 20 (Department of Agriculture:  "Due to the Radical Left Democrat shutdown, this government website will not be updated during the funding lapse.  President Trump has made it clear he wants to keep the government open and support those who feed, fuel, and clothe the American people."), 21 (Small Business Administration:  "Every day that Senate Democrats continue to oppose a clean funding bill, they are stopping an estimated 320 small businesses from accessing $170 million in SBA-guaranteed funding."), 22 (Department of the Treasury:  "The radical left has chosen to shut down the United States government in the name of reckless spending and obstructionism."), 23 (Department of Health and Human Services:  "Mission-critical activities of HHS will continue during the Democrat-led government shutdown.  Please use this site as a resource as the Trump

Administration works to reopen the government for the American people.").[8]  Apparently, that wasn't enough.  The Department waited until its furloughed employees lost access to their e-mail, then gratuitously changed their out-of-office messages to include yet another partisan message, thereby turning its own workforce into political spokespeople through their official e-mail accounts.  The Department may have added insult to injury, but it also overplayed its hand.

While the Department's employees, along with other dedicated federal workers, have sacrificed much during the government shutdown, they still hold on to their Frist Amendment rights.  And by promulgating the Revised Message, the Department has infringed upon those rights by unlawfully compelling its employees' speech.  The Court must therefore proceed to consider AFGE's requested remedy.

D.  Permanent Injunction

Because the Department violated the First Amendment rights of its employees who have been furloughed or placed on administrative leave, AFGE prevails on the merits and is entitled to summary judgment.  But AFGE also seeks declaratory and permanent injunctive relief.  Specifically, it asks the Court to order the removal of "all partisan political language" from Department employees' out-of-office messages and prohibit the Department from including "partisan political speech" in any future messages.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  AFGE must demonstrate that (1) "it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are

---

[8] See Pharm. Rsch. & Manufacturers of Am. v. HHS, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction."[9] Id.

Courts in this district often consider the first two factors together.  See, e.g., Jenner & Block LLP v. DOJ, 784 F. Supp. 3d 76, 113 (D.D.C. 2025); Ridgely v. Lew, 55 F. Supp. 3d 89, 98 (D.D.C. 2014) (Cooper, J.).  In this case, AFGE has shown that its members are suffering an irreparable injury that cannot be repaired without a permanent injunction.  "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod, 427 U.S. at 373).  If the Court does not permanently enjoin the Department from hijacking its employees' e-mail accounts to send partisan messaging, the Revised Message will continue to be sent in response to any incoming e-mails.

The third and fourth factors "merge" when the government is the opposing party.  See Media Matters for Am. v. Paxton, 138 F.4th 563, 585 (D.C. Cir. 2025) (citing Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).  And, put simply, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016).  "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  Id. (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Thus, AFGE has demonstrated that it is entitled to permanent injunctive relief.

---

[9] The government does not dispute that if AFGE is successful on the merits, it can satisfy the remaining criteria for permanent injunctive relief.

The Court's injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). And, as the Supreme Court recently explained, this Court's equitable authority is limited to providing complete relief to the plaintiff *before the Court*. See Trump v. CASA, Inc., 606 U.S. 831, 851–53 (2025). For that reason, the Court's permanent injunction is limited to AFGE's members affected by the Revised Message.[10]

### IV.    Conclusion

For the foregoing reasons, the Court will grant AFGE's motion for summary judgment and deny the government's cross-motion for summary judgment. A separate Order shall accompany this memorandum opinion.

 

 

 

 
                                                   _____

                                                 CHRISTOPHER R. COOPER
                                                 United States District Judge

Date:  November 7, 2025

---

[10] If it is technologically impossible to immediately remove partisan messaging from the out-of-office messages associated with only AFGE members' e-mail accounts, then the Court will order the Department to remove such messaging from all affected employees' e-mail accounts.